# Illinois Official Reports

## Appellate Court

---

### *Grinyov v. 303 Taxi, L.L.C.*, 2017 IL App (1st) 160193

---

| | |
|---|---|
| Appellate Court Caption | EDVARD GRINYOV, Plaintiff-Appellee, v. 303 TAXI, L.L.C., VEM TRANSPORTATION LLC, and IGOR MASLENNIKOV, Defendants (303 Taxi, L.L.C., Defendant-Appellant). |
| District & No. | First District, Second Division<br>Docket No. 1-16-0193 |
| Filed | March 14, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-L-11555; the Hon. Edmund Ponce De Leon, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Scott L. Howie, James J. Sipchen, and Matthew J. Ligda, of Pretzel & Stouffer Chtrd., of Chicago, for appellant.<br><br>Michael S. Baird and Eric J. Parker, of Stotis & Baird Chtrd., of Chicago, for appellee. |
| Panel | PRESIDING JUSTICE HYMAN delivered the judgment of the court, with opinion.<br>Justices Pierce and Mason concurred in the judgment and opinion. |

**OPINION**

¶ 1      Edvard Grinyov brought a negligence action after being injured when a taxicab driven by Igor Maslennikov struck him. The cab was owned by VEM Transportation LLC, Maslennikov's employer. Grinyov sued Maslennikov, VEM Transportation LLC, and 303 Taxi, L.L.C., which provided dispatch services to VEM. Grinyov contended that VEM and 303 Taxi are vicariously liable for his injuries as they were engaged in a joint venture or, in the alternative, had a principle-agency relationship. The jury returned a special verdict against all three defendants on plaintiff's agency theory. The trial court denied defendants' motion for a judgment notwithstanding the verdict.

¶ 2      303 Taxi appeals, contending (i) the evidence did not support the jury's finding that VEM was 303 Taxi's agent and (ii) 303 Taxi was unfairly prejudiced by evidence concerning the parties' insurance coverage and 303 Taxi's financial status. We affirm, finding that the evidence supports the jury's finding that VEM and 303 Taxi had a principal-agent relationship. And, the trial court did not abuse its discretion by admitting evidence regarding insurance and VEM and 303 Taxi's financial arrangement because of its relevancy to the agency issue.

¶ 3                                      BACKGROUND

¶ 4      Henry Elizar, Eugene Rapaport, and David Gauer own 303 Taxi, a limited liability taxicab dispatch company. The three men also own Eastern Cab and Insurance Company. Both companies have an office at 5200 North Otto Avenue, Chicago. 303 Taxi does not own, lease, or operate taxicabs. Its business involves providing dispatch service and equipment to taxicab owners and drivers (referred to as affiliates) in the northern suburbs. The cab owners pay 303 Taxi a monthly fee (sometimes referred to as dues) in exchange for dispatch services, rent of the dispatch equipment, and the cost of insurance. 303 Taxi advertises for passengers, takes calls from customers, and dispatches calls to the cab drivers. The cab closest to the passenger is offered the first opportunity to accept the fare; if a driver does not accept, the fare goes to the next closest driver, and so on. Affiliate cab owners pay monthly dues; generally, a set amount, although dues can vary depending on the location where the cab operates. 303 Taxi does not send monthly bills to an affiliate. It maintains each affiliate's balance on a computer at 303 Taxi's office, where affiliates go to pay the fee each month. 303 Taxi inspects its affiliates' cabs to ensure cleanliness and good overall condition and to comply with standards enforced by the municipalities in which the cabs operate.

¶ 5      VEM, a company that owned and leased cabs, was a 303 Taxi affiliate. VEM was co-owned by Arthur Popov and Auto Pro Care, Inc., of Savanna, Illinois. Igor Maslennikov worked as a part-time manger for VEM. Plaintiff, Edvard Grinyov was self-employed and installed computerized dispatch equipment in taxicabs. On June 4, 2009, while working in a garage near 303 Taxi's office, Grinyov went outside to talk to a cab driver. Maslennikov, who was bringing one of VEM's cabs to 303 Taxi's office for an inspection, backed up into Grinyov, pinning Grinyov's leg to a fence and seriously injuring him. Maslennikov asserted that Jim Antoneulle, a 303 Taxi employee, asked him to bring the cab to the office for an inspection; Antoneulle denied he was working that day.

¶ 6      Grinyov sued Maslennikov, VEM, and 303 Taxi for negligence, claiming that VEM and 303 Taxi had a joint venture or, in the alternative, a principle-agency relationship, and thus, both are vicariously liable for his injuries. VEM and 303 Taxi admitted VEM's and

Maslennikov's liability but denied a joint venture or agency relationship between them, as well as the extent of Grinyov's injuries.

¶ 7    At trial, Arthur Popov testified that he and Auto Pro Care, Inc., co-owned VEM until 2011 or 2012 when VEM went out of business. Popov said he did not know anything about Auto Pro Care or anyone associated with the company after a friend who briefly worked there sold his interest. VEM owned 5 or 6 cabs and managed about 55 to 60 cabs owned by VEM investors; Popov could not name any of the investors. According to Popov, VEM had an agreement with 303 Taxi for dispatch services for all of the cabs VEM owned or leased. The agreement was not in writing but something Popov and "someone at 303 talked about." All VEM cabs had 303 Taxi signage and colors. In 2009, Popov charged VEM cabdrivers $1600 a month to drive a cab. He paid $1000 a month per cab to 303 Taxi for dispatch services, equipment rental, and insurance. Popov said the $1000 fee to 303 Taxi sometimes fluctuated if, for instance, a cab was not in service, but the fee did not depend on how much a cabdriver earned per month. Popov used the remaining $600 to pay for cab maintenance and repairs, license plates, and registration. VEM's tax return in 2009 showed that the company's gross income was $807,380, its business expenses were about $587,000, of which $515,000 went to 303 Taxi. VEM paid no wages or salaries that year, no partners took a draw, and the company reported a loss of $1578.

¶ 8    Popov testified that 303 Taxi bought insurance for VEM's cabs and paid the premium upfront. VEM then reimbursed 303 Taxi for the cost of insurance through the monthly $1000 fee. He acknowledged that in his deposition he said he paid Eastern Cab and Insurance Company directly for insurance coverage.

¶ 9    On cross-examination, Popov said (i) VEM and 303 Taxi were separate businesses, (ii) 303 Taxi did not have an ownership interest in VEM, (iii) 303 Taxi was not involved in the leasing relationship between VEM and the cabdrivers, and (iv) he decided where to take cabs for repairs. Popov acknowledged he occasionally used a desk in the 303 Taxi building but said it was available to all 303 Taxi's affiliates as well. VEM interviewed and hired its drivers, and 303 Taxi was not initially involved in the interview process. Drivers had sole discretion in deciding when and where to drive their cabs, depending on availability, and whom to pick up. 303 Taxi trained drivers on using the dispatch equipment but did not give driving lessons.

¶ 10   Eastern Cab and Insurance Company was owned by 303 Taxi's co-owners and shared an office building with 303 Taxi. Lillian Podunavac, Eastern Cab's only employee, testified that she worked with Maslennikov in procuring insurance coverage for VEM and had no dealings with Popov. She said mail from the insurance company to VEM was sent "care of 303 Taxi." When Grinyov's attorney showed Podunavac an application for insurance coverage for a VEM cab, she acknowledged the handwriting was hers, that no one from VEM was named on the form, and the signature of the insured was blank. On cross-examination, 303 Taxi's attorney displayed part of VEM's insurance policy for the jury and elicited from Podunavac that the policy had the minimum statutory limits of $250,000 per person and per accident.

¶ 11   Sergey Rapoport, a 303 Taxi employee, testified by videotaped evidence deposition. In June 2009, Rapoport was a driver coordinator, working with the cab drivers and affiliates to make sure that they complied with state and municipal laws and were properly insured. Rapoport also ran training classes for new cab drivers. Rapoport taught the drivers how to use the dispatch equipment and denied teaching them how to drive a cab. In a prior deposition, however, Rapoport said he taught drivers "what they are supposed to do in driving the cab."

Rapoport also handled customer complaints. When he received a customer complaint, he contacted the driver to try to rectify the problem. If a driver continued to have problems, 303 Taxi could suspend or discontinue dispatch service for the driver. On cross-examination, Rapoport testified that 303 Taxi does not have its own rules for cab drivers and only enforced rules of the municipalities where a cab was operating, including rules regulating the appearance of the cab and the driver, licensing, and the driver's interactions with the customer.

¶ 12        David Gauer, another 303 Taxi owner, testified by videotaped evidence deposition that 303 Taxi inspects cabs to make sure they comply with municipal ordinances because a municipality can suspend a cab's license or prohibit a cab from operating there, which would adversely affect 303 Taxi's ability to collect its monthly fee from affiliates. Cab owners are responsible for maintaining and repairing their cabs, and 303 Taxi did not require the owners to take the cabs to any particular repair shop. 303 Taxi does not train cab drivers on how to drive a cab, tell drivers that they have to accept a passenger, or tell drivers what territory in which to operate. According to Gauer, 303 Taxi has never had an ownership interest in VEM or vice versa and never jointly owned, managed, or controlled equipment or property. He assumed all affiliates had a written agreement with 303 Taxi but acknowledged that VEM did not have one. As to insurance, affiliates apply for a policy, 303 Taxi pays the premium, and affiliates reimburse 303 Taxi through the monthly dues.

¶ 13        Igor Maslennikov testified by videotaped evidence deposition that he was a part-time manager at VEM and had some responsibility for interviewing new drivers, teaching drivers to use the dispatch equipment, and bringing cabs to the office for inspections. Maslennikov previously worked for 303 Taxi before buying several cabs from 303 Taxi and starting his own cab company, which he later sold to 303 Taxi. Maslennikov worked at a desk in 303 Taxi's building and had a key to 303 Taxi's office but said on cross-examination that the desk could be used by other affiliates and was not reserved for VEM.

¶ 14        According to Maslennikov, 303 Taxi inspected cabs on a regular basis to make sure they were clean and in good condition, had current licenses and certifications, and generally complied with municipal ordinances. On the day of the accident, Jim Antoneulle, a manager at 303 Taxi, asked Maslennikov to bring cab number 82, which was not being leased at the time, to the office for inspection. Maslennikov went to 303 Taxi's office for the keys and then to the street, where the cab was parked. When Maslennikov was backing the cab out of a parking space, he ran into Grinyov, injuring him. He said that he thought something was wrong with the cab because it accelerated backward, even though his foot was on the brake.

¶ 15        Antoneulle is an individual affiliate cab driver and works for 303 Taxi in exchange for free dispatch services. He manages 303 Taxi's business records, including certificates of insurance and vehicle registrations, inspects cabs, and interacts with municipalities to keep the company apprised of new ordinances.

¶ 16        Antoneulle testified that the State and municipalities required new cab drivers to undergo a background check. Before being permitted to drive for 303 Taxi, they must also take a written test and be approved by a 303 Taxi driver coordinator. They are then sent to a training class at 303 Taxi's office to learn how to use the dispatch equipment, dress while driving a cab, navigate the municipality in which the cab will be operating, and maintain a clean cab. Credit card charges go to 303 Taxi, and drivers must accept 303 Taxi coupons and 303 Taxi corporate account customers. Although Antoneulle said 303 Taxi does not have any rules beyond what municipal regulations require, during a deposition he stated 303 Taxi also had rules regarding

use of the radio and the air conditioning and "things of that nature." Drivers who violate rules are subject to a suspension of the dispatch services. Suspended drivers can still drive the cab but cannot use 303 Taxi's dispatch service, which accounts for about 90% of suburban cab business.

¶ 17    When questioned about whether he asked Maslennikov to bring cab 82 to 303 Taxi's office on the day of the accident, Antoneulle claimed he was in Michigan at the opening of a casino and had hotel receipts but could not produce them. Later, plaintiff's attorney introduced into evidence an article showing that the casino opened in 2007, two years before the accident. Antoneulle said that even if he had been at the office that day, he would not have told Maslennikov to bring the cab to the office for an inspection because inspection requests were automatically generated by a computer.

¶ 18    After closing arguments, the jury returned a special verdict for Grinyov and against defendants based on his agency theory not his joint venture theory. The jury awarded damages of nearly $3 million. Defendants filed a motion for a judgment notwithstanding the verdict or a new trial as to the agency relationship. Alternatively, defendants contended a new trial was warranted because the trial court improperly admitted evidence about insurance and payments VEM made to 303 Taxi. The trial court denied the motion. The court found that the jury heard sufficient evidence of control and leverage by 303 Taxi to find an agency relationship, including 303 Taxi's requirement that new VEM cab drivers attend a training class and pass a test, its discipline of cabdrivers, its procurement of insurance for affiliates, and its requirement that VEM cab drivers accept 303 Taxi coupons. The court also noted that VEM conducted business out of 303 Taxi's office and had the same mailing address as 303 Taxi and that VEM made no money in 2009, while 303 Taxi realized more than $500,000 in dues from VEM. Moreover, the trial court found that even if this evidence of control was not a basis for finding a general agency relationship, the circumstances of the accident, namely that Maslennikov was driving the cab at Antoneulle's direction for an inspection at 303 Taxi's office, was sufficient for the jury to find an "agency event."

¶ 19    The trial court also rejected defendants' contention that the trial court erred in admitting evidence about insurance and the amounts of money VEM paid to 303 Taxi. The court found that testimony regarding insurance was properly permitted to prove agency and the jury was properly instructed to only consider it for that purpose. The trial court further noted that the defendants' attorney placed the amount of the insurance policy limits before the jury. The trial court acknowledged that Illinois law prohibits evidence of a party's poverty or wealth for the sole purpose of arousing sympathy for a party but found it was properly admitted to show 303 Taxi's leverage and control over VEM as evidence of agency. Further, the trial court found that 303 Taxi was not prejudiced by the evidence. 303 Taxi alone appeals.

¶ 20                                ANALYSIS

¶ 21    303 Taxi argues the trial court erred in failing to grant its motion for a judgment notwithstanding the verdict because the evidence did not support Grinyov's agency theory. Alternatively, 303 Taxi asserts a new trial is required because (i) the evidence does not support the jury's agency finding and (ii) the jury heard repeated inadmissible and irrelevant testimony regarding insurance coverage, 303 Taxi's wealth and revenues, and 303 Taxi's owners' and officers' ownership of other nonparty corporate entities.

¶ 22    We first note that 303 Taxi's brief is inappropriately one-sided in its recitation of the facts, leaving out much of the disputed testimony and evidence presented at trial. A party challenging a jury's verdict is in a poor position to ignore evidence supporting that verdict. As pointed out by Grinyov, there was much disputed evidence at trial and the principals of VEM and 303 Taxi were impeached on numerous occasions and on issues relating to the existence of an agency relationship. While the evidence of that relationship may not have been particularly strong, it was enough to go to the jury. And 303 Taxi falls short in its effort to meet the high burden imposed on a party seeking to overturn a jury verdict.

¶ 23    A motion for judgment notwithstanding the verdict should be granted only when " 'all of the evidence, when viewed in [the light] most favorable to the opponent, so overwhelmingly favors [a] movant that no contrary verdict based on that evidence could ever stand.' " *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 178 (2006) (quoting *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967)). Put differently, "a motion for judgment [notwithstanding the verdict] presents 'a question of law as to whether, when all of the evidence is considered, together with all reasonable inferences from it in its aspect most favorable to the plaintiffs, there is a total failure or lack of evidence to prove any necessary element of the [plaintiff's] case.' " *York*, 222 Ill. 2d at 178 (quoting *Merlo v. Public Service Co.*, 381 Ill. 300, 311 (1942)). We review a trial court's decision to deny a motion for judgment notwithstanding the verdict *de novo*.

¶ 24    Our supreme court has articulated a different standard for the granting of a new trial because the evidentiary situation that would require a new trial differs from a situation that would justify the entry of a judgment notwithstanding the verdict. *Maple v. Gustafson*, 151 Ill. 2d 445, 453 (1992). A motion for a new trial should be granted where the jury's verdict is against the manifest weight of the evidence. *Id.* at 454. Manifest weight of the evidence means the opposite conclusion is clearly evident or the findings of the jury are unreasonable, arbitrary, and not based on any of the evidence. *Id.* As the decision to grant a new trial involves a matter of the trial court's discretion, we will not reverse this ruling absent an abuse of that discretion. *Id.* at 455.

¶ 25                    Was VEM Transportation 303 Taxi's Agent?

¶ 26    303 Taxi first contends that Grinyov failed to present evidence to make out a *prima facie* case for vicarious liability through agency. Generally, a person injured by someone's tortious action must seek a remedy from the person who caused the injury. *Adames v. Sheahan*, 233 Ill. 2d 276, 298 (2009). The principal-agent relationship provides an exception to the general rule. *Woods v. Cole*, 181 Ill. 2d 512, 517 (1998). "Under the doctrine of *respondeat superior*, a principal may be held liable for the tortious actions of an agent which cause a plaintiff's injury, even if the principal does not himself [or herself] engage in any conduct in relation to the plaintiff." *Id.* As a general rule, no vicarious liability exists for the actions of independent contractors. *Petrovich v. Share Health Plan of Illinois, Inc.*, 188 Ill. 2d 17, 31 (1999). " 'An independent contractor is one who undertakes to produce a given result but in the actual execution of the work is not under the orders or control of the person for whom he [or she] does the work but may use his [or her] own discretion in things not specified *** [and] without his being subject to the orders of the [person for whom the work is done] in respect to the details of the work.' " *Horwitz v. Holabird & Root*, 212 Ill. 2d 1, 13 (2004) (quoting *Hartley v. Red Ball*

*Transit Co.*, 344 Ill. 534, 539 (1931)). The label independent contractor, however, does not bar the attachment of vicarious liability if he or she is also an agent. *Id.*

¶ 27    The facts and circumstances of each case determine whether a person is an agent or an independent contractor. *Petrovich*, 188 Ill. 2d at 46. "[T]he cardinal consideration is whether that person retains the right to control the manner of doing the work." *Id.* Other factors courts consider include (i) the question of hiring, (ii) the right to discharge, (iii) the manner of direction of the servant, (iv) the right to terminate the relationship, and (v) the character of the supervision of the work done. *Id.* The presence of one or more of these facts and indicia "merely serve[s] as guides to resolving the primary question of whether the alleged agent is truly an independent contractor or is subject to control." *Id.* at 47. The burden of proving the existence and scope of an agency relationship rests on the party seeking to impose liability on the principal. *Adames*, 233 Ill. 2d at 299. A dispute as to the extent of the parties' relationship, existence, and scope of agency presents questions of fact for a jury to determine. *McHale v. Kiswani Trucking, Inc.*, 2015 IL App (1st) 132625, ¶ 96.

¶ 28    303 Taxi asserts that Grinyov failed to establish an agency relationship and that the evidence fell short of a jury question that could reasonably be answered in Grinyov's favor. 303 Taxi first contends the evidence did not establish it retained the right to control the manner in which VEM or any of its affiliates provided taxicab services. 303 Taxi asserts that the witnesses uniformly testified that 303 Taxi had a limited role of selling dispatch services and leasing dispatch equipment in exchange for a fee, which constituted a business relationship not an agent-principal relationship. Relying on *Daniels v. Corrigan*, 382 Ill. App. 3d 66 (2008), and *Oliveira-Brooks v. Re/Max International, Inc.*, 372 Ill. App. 3d 127 (2007), 303 Taxi asserts that evidence of a business relationship, even a close one, does not establish the right to control necessary for an agency relationship.

¶ 29    In *Daniels*, a cab driver got into a traffic accident while driving a cab he leased from an individual owner. The cab owner purchased the cab medallion from Yellow Cab, which also financed the purchase. 382 Ill. App. 3d at 68. A City of Chicago ordinance mandated that the cab owner be permitted to use the Yellow Cab colors and dispatch service for a fixed weekly fee, which included affiliation dues, insurance premiums, and loan repayment. *Id.* The agreement expressly provided that the owner was an independent contractor and that the affiliation agreement did not create a principal-agent or joint venture relationship. *Id.* at 75.

¶ 30    After the accident, the plaintiff sued the cab driver and owner, as well as Yellow Cab and related companies, on an agency theory. Defendants moved for summary judgment. The trial court granted the motion, finding that the Yellow Cab defendants did not control the cab owner or the operation of the cab at the time of the accident. *Id.* at 67. We noted that the affiliation agreement expressly disclaimed a principal-agent relationship (*id.* at 75) but acknowledged that ' "the declaration of the parties is not controlling where the conduct of the parties demonstrates the existence of an agency relationship.' " *Id.* (quoting *Oliveira-Brooks*, 372 Ill. App. 3d at 134). After examining numerous factors, this court found that irrespective of the express agreement, Yellow Cab and the other corporate defendants did not exercise the requisite control to establish an agency relationship. *Id.* at 80. The taxicab owner set the hours of operation and paid all expenses for the taxicab, and the driver was free to decide which fares to pick up and was not required to report the location of the cab, maintain a trip sheet, keep written records of fares, or report fares collected to Yellow Cab. *Id.* at 75-76. As to the purchase of insurance, the court found that facilitating the cab owners' compliance with a

statutory requirement of minimum insurance did not establish an agency relationship. *Id.* at 77. The court also disagreed with plaintiff's contention that defendants required affiliates to purchase insurance from an insurance company under defendant's control, noting that the affiliation agreement expressly stated that the insurance could be written by "American Country or any other duly licensed insurance company with an overall rating of 'A' or higher." *Id.* at 78. The court rejected plaintiff's other evidence of control, including contractual restriction on the owner's transfer of the taxi medallion, the power of attorney the cab owner gave to the corporate defendants, and the corporate defendants' status as registered agent for the cab owner. *Id.* at 76-77, 79.

¶ 31        In *Oliveira-Brooks*, also relied on by 303 Taxi, this court rejected the argument that "as a matter of law, evidence of insurance can be used to establish an actual agency relationship where no other evidence of the right to control exists." *Oliveira-Brooks*, 372 Ill. App. 3d at 136. We reviewed a grant of summary judgment in favor of Re/Max International. The case hinged on whether a real estate sales associate was an agent of Re/Max International. After reviewing the record, the court found the evidence showed Re/Max International had no right "to control the manner and method of work of Re/Max Midtown's sales associates, including [the sales associate], and could not affect the legal relationships of Re/Max International." *Id.* Although the record showed that Re/Max International had policies related to the general duties of a sales associate, the court considered more persuasive the fact that the sales associate had "complete discretion in the details of his day-to-day real estate sales operation." *Id.* at 135-36. "[W]ithout some indicia of the right to control the day-to-day real estate business operations," the fact that the sales associate was required to obtain his own insurance and name Re/Max International as an additional insured "cannot, as a matter of law, create a genuine issue of material fact to establish an actual agency relationship." *Id.* at 136. The requirement to name Re/Max International as an additional insured was the company's attempt to "shift the risk of loss onto [the sales agent]" rather than create a principal-agent relationship. *Id.*

¶ 32        303 Taxi asserts that just as in *Daniels* and *Oliveira-Brooks*, the evidence was not sufficient to suggest an agency relationship with VEM. Neither case supports 303 Taxi's argument. First, unlike *Daniels*, VEM and 303 Taxi had no written agreement expressly disclaiming a principal-agent or joint venture relationship. While we agree with 303 Taxi that the *Daniels* court looked at "various contractual restraints" in the affiliation agreement, in finding that no principal-agent or joint venture relationship existed, the lack of any documented agreement between VEM and 303 Taxi is a key factor in assessing their relationship. Turning to the evidence, the jury heard that potential new drivers had to take a test at 303 Taxi and be approved by one of 303 Taxi's driver coordinators. Once approved, the new driver had to take a class at 303 Taxi's office, which was taught by a 303 Taxi employee. Although some witnesses testified that 303 Taxi only trained new drivers how to use the dispatch equipment, other witnesses testified the classes more broadly addressed how to be a cabdriver, how to make money, and how to drive a cab. 303 Taxi also fielded customer complaints, disciplined individual drivers by taking away dispatch service, and required drivers to accept 303 Taxi coupons and charges to 303 Taxi corporate customer accounts.

¶ 33        303 Taxi contends that *Daniel*s and *Oliveira-Brooks* rejected the notion that control sufficient to establish a principal-agent relationship could be demonstrated by 303 Taxi's requirement that affiliates purchase insurance. Both cases held that facilitating compliance with a statutory requirement of minimum insurance did not establish an agency relationship.

*Daniels*, 382 Ill. App. 3d at 78. Thus, 303 Taxi's purchase of the statutory minimum amount of insurance for which it was later reimbursed by VEM through the monthly dues was not, standing alone, sufficient evidence to establish a principal-agent relationship. But, that evidence, coupled with the cumulative evidence of control 303 Taxi exercised over VEM was more than sufficient to support the jury's finding of agency.

¶ 34     First, the nature of the accident in *Daniels* differs in significant respects. Here, the jury heard testimony that Antoneulle, a 303 Taxi manager, directed Maslennikov, a VEM employee, to retrieve the cab and deliver it to 303 Taxi's office. In the course of completing that task for 303 Taxi, Maslennikov drove into and injured Grinyov. Conversely, in *Daniels*, the plaintiff was injured while riding in a cab that was affiliated with Yellow Cab but was not being driven at the direction of anyone from Yellow Cab. The trial court found that this event alone supported finding that 303 Taxi retained sufficient control over VEM to establish an agency relationship. We do not address the sufficiency of this evidence alone but conclude that, along with the other evidence presented at trial, it supported the jury's finding of agency.

¶ 35     The testimony at trial showed that 303 Taxi conducted regular inspections of VEM's cabs. 303 Taxi asserts it inspected its affiliate's cabs to ensure they complied with municipal requirements and to protect its goodwill and reputation, which should not saddle it with the responsibilities of being VEM's principal. But, the jury heard testimony from Sergey Rapoport that 303 Taxi's inspections were in addition to those conducted by the State and municipalities and 303 Taxi conducted those inspections on a regular basis anytime it wanted to.

¶ 36     In addition to the inspections, new drivers had to take a test at 303 Taxi's office and be approved by a 303 Taxi coordinator. Once approved, the driver had to take a training class, conducted by 303 Taxi at its office, which, according to witnesses, not only addressed how to use the dispatch equipment but also covered how to drive a cab and more general issues, such as how to dress when driving the cab, how to navigate the municipality in which the cab will be operating, and how to maintain a clean cab. In addition, witnesses testified that along with municipal regulations, 303 Taxi enforced "company rules" addressing things like running the air conditioner and playing the radio in the cab. Further, on top of a suspension by a municipality for violating its regulations, a VEM driver could have his or her dispatch services suspended by 303 Taxi. Although a cab driver could continue to drive the cab while dispatch services were suspended, because 90% of a suburban cab's business comes from a dispatcher, the driver's income would be greatly curtailed.

¶ 37     Additional evidence supports the jury's finding of an agency relationship. Specifically, VEM drivers were required to use 303 Taxi coupons and accept charges on 303 Taxi corporate client accounts. VEM used a desk in 303 Taxi's office building and its mail was sent to that office in care of 303 Taxi. VEM paid more than $500,000 to 303 Taxi in 2009 and its owners earned no money from the company. All of this evidence, when considered together with the circumstances of the accident—namely that the cab was being driven by a VEM employee at the direction of a 303 Taxi manager—and with all reasonable inferences in favor of Grinyov, we cannot find a total failure or lack of evidence to prove an agency relationship. Thus, the trial court did not err in denying 303 Taxi's motion for judgment notwithstanding the verdict. Further, because the verdict is not against the manifest weight of the evidence, *i.e.*, the jury's findings are not unreasonable or arbitrary, a new trial is not warranted.

¶ 38                                    Prejudicial Evidence

¶ 39         303 Taxi next contends the trial court's decision to admit prejudicial and nonprobative evidence is grounds for a new trial. Specifically, 303 Taxi asserts that the jury heard improper evidence about 303 Taxi's insurance coverage and its financial condition, as suggested by the amount of dues it received from VEM.

¶ 40         The admission of evidence falls within the sound discretion of the trial court, and we will not reverse the trial court unless that discretion was plainly abused. *Snelson v. Kamm*, 204 Ill. 2d 1, 33 (2003). While not admissible to show fault, the existence of insurance may be shown in connection with issues such as agency, ownership, control, bias, or prejudice of a witness. *Boettcher v. Fournie Farms, Inc.*, 243 Ill. App. 3d 940, 945 (1993). The testimony of liability insurance was properly admitted in an effort to show that 303 Taxi exercised control over VEM and thus to establish that an agency relationship existed. From the key insurance witness, Irene Podunavac, VEM's attorney elicited testimony about who procured and paid for the insurance for VEM, how the policy was updated to add new vehicles, and how she corresponded with VEM. The insurance evidence was not presented to show that 303 Taxi was at fault.

¶ 41         In addition, any error in the admission of evidence about insurance was cured by a limiting instruction, which read: "Whether a party is insured or not insured had no bearing on any issue that you must decide with this exception: If you find that 303 Taxi paid for insurance for VEM Transportation, you may consider this fact in deciding whether VEM Transportation was 303 Taxi's agent. With that exception, you must refrain from any inference, speculation, or discussion about insurance."

¶ 42         It is presumed that the jury understood and followed the court's instructions (see *Babikian v. Mruz*, 2011 IL App (1st) 102579, ¶ 20), and 303 Taxi offers no evidence suggesting the jury disregarded the instruction. Moreover, although Grinyov initially presented evidence about insurance, 303 Taxi's attorney introduced evidence showing that VEM had the statutorily required minimum of $250,000 in coverage. Thus, we find no abuse of discretion in the trial court's admission of evidence about insurance coverage.

¶ 43         Lastly, 303 Taxi contends the trial court erred in permitting the jury to hear evidence about the amounts VEM paid in monthly fees because it was immaterial and prejudicial to 303 Taxi. Specifically, Grinyov's attorney elicited from VEM's owner, Arthur Popov, testimony that VEM grossed about $800,000 in 2009 and paid 303 Taxi about $515,000 while reporting a loss that year. 303 Taxi contends "the jury was not equipped to use that evidence for any proper purpose" and it likely gave the jury the impression that 303 Taxi had substantial assets, especially in light of testimony that it has many other affiliations, which is immaterial and improper when it appeals to the prejudice of the jury.

¶ 44         "Evidence offered for the *sole* purpose of emphasizing a party's wealth or poverty is immaterial and improper when it appeals to the prejudice of the jury." (Emphasis added.) *Stathis v. Geldermann*, 295 Ill. App. 3d 844, 862 (1998) (citing *DiPaolo v. Johnson*, 15 Ill. App. 3d 735, 739 (1973)). But, evidence regarding a party's financial circumstances may be admitted if relevant to an issue. *McHale*, 2015 IL App (1st) 132625, ¶ 35. In *McHale*, the plaintiff elicited testimony that the defendant's "gross sales were above 1 million" and it "made millions of dollars" over the course of its contract with the codefendant. (Internal quotation marks omitted.) *Id.* ¶ 33. The evidence was properly admitted because the "testimony was entirely relevant to one of the questions before the jury: whether [codefendant]

had the right to control [the defendant] such that [the defendant] was an agent of [the codefendant]." *Id.* ¶ 35. "The thrust of plaintiff's questions *** was to show that the majority of [the defendant's] business came from [the codefendant], leading to the inference that [the codefendant] had leverage and control over [defendant]. Control by the principal over an agent is the crux of any agency determination." *Id.* Further, the reviewing court noted the "record shows plaintiff's counsel did not improperly stress [defendant's] financial condition" and that "[h]is questions *** were not solely intended to demonstrate [defendant's] wealth to the jury." *Id.*

¶ 45 Similarly, VEM's attorney introduced testimony that the company paid nearly $515,000 to 303 Taxi while reporting a loss of $1578 for 2009 not for the sole purpose of emphasizing 303 Taxi's wealth but to show that because the majority of VEM's business came from 303 Taxi, there is an inference that 303 Taxi exercised leverage and control over VEM to create an agency relationship. Thus, the evidence related to the agency issue and was appropriate. Moreover, as in *McHale*, Grinyov's counsel did not improperly stress 303 Taxi's financial condition and his questions were not solely intended to demonstrate 303 Taxi's wealth to the jury.

¶ 46 Accordingly, the trial court did not abuse its discretion in admitting the testimony and denying the motion for a judgment notwithstanding the verdict.

¶ 47 Affirmed.