# Illinois Official Reports

## Appellate Court

***McNerney v. Allamuradov*, 2017 IL App (1st) 153515**

| | |
|---|---|
| Appellate Court Caption | SUSANNA MCNERNEY, Plaintiff-Appellant and Cross-Appellee, v. MUHTAR ALLAMURADOV, Defendant, 303 TAXI, LLC, GRAND TRANSPORTATION, INC., Defendants-Appellees and Cross-Appellants. |
| District & No. | First District, Fifth Division<br>Docket No. 1-15-3515 |
| Filed<br>Rehearing denied | June 30, 2017<br>August 7, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 2013-L-009759; the Hon. Kathy M. Flanagan, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Daniel J. Mohan, Heather R. Adams, and Vy'Shaey M. Mitchell, of Daley Mohan Groble, P.C., of Chicago, for appellant.<br><br>John J. Meehan and Donna D. Ciancio, of Law Offices of John J. Meehan, P.C., and Mark G. Poulakidas and Michael L. Abel, of Haynes, Studnicka, Kahan & Poulakidas, LLC, both of Chicago, for appellees. |

| Panel | JUSTICE REYES delivered the judgment of the court, with opinion. Presiding Justice Gordon and Justice Lampkin concurred in the judgment and opinion. |
|---|---|

**OPINION**

¶ 1    After Susanna McNerney contacted 303 Taxi, L.L.C. (303), to arrange transportation, a taxicab marked with 303's logo, telephone number, and distinctive colors arrived at McNerney's residence at the designated time. The taxicab driver, Muhtar Allamuradov, sexually assaulted McNerney as he drove her to the airport. McNerney filed an action in the circuit court of Cook County against (i) Allamuradov, (ii) 303, a taxicab dispatch company, and (iii) Grand Transportation, Inc. (Grand), which had leased the taxicab to Allamuradov. On appeal, McNerney challenges the grant of summary judgment in favor of 303 and Grand. She also contends that the circuit court erred in not permitting her to supplement the record with certain "newly discovered" evidence, including a license application completed by Allamuradov. In separately-filed cross-appeals, Grand and 303 contend that this court lacks jurisdiction because the circuit court improperly considered McNerney's late-filed motion contesting the grant of summary judgment. For the reasons set forth below, we find that this court has jurisdiction, and we reverse the decision of the circuit court granting summary judgment and remand this matter for additional proceedings.

¶ 2                                    I. BACKGROUND

¶ 3    Prior to the incident involving McNerney, the defendants had executed two agreements: (1) a dispatch services agreement between Grand and 303, and shortly thereafter, (2) a taxicab lease agreement between Grand and Allamuradov. Pursuant to the dispatch services agreement, 303 provided various dispatch services to Grand, and Grand was permitted to use 303's logo, colors, and contact information on its taxicabs. Pursuant to the taxicab lease agreement, Grand leased a taxicab to Allamuradov. 303 and Allamuradov did not enter into any written agreement.

¶ 4    The taxicab lease agreement provided that Allamuradov, at his sole discretion, could utilize services provided by Grand, which included dispatch services through 303, redemption of credit card payments through 303, participation in 303's voucher program, and routine repair and maintenance services from Grand. Grand was required to provide an operable vehicle equipped with a taxi meter, access to radio/computer dispatching service from 303 and credit card reading equipment, affiliation with 303 and license to use the "303 Taxi" name and service marks for display on the taxicab, and public liability and property damage insurance covering itself and Allamuradov in the amounts prescribed by law. Grand could terminate the agreement without advance notice under specified circumstances, including nonpayment of the lease fee or if Allamuradov's driving record became an unacceptable insurance risk. Allamuradov's responsibilities included reporting any accident to the proper authorities and to Grand's insurer; prompt payment of parking tickets, traffic citations, and fines; purchase of gasoline and all other operating expenses; and liability for physical damage to the taxicab and equipment beyond the normal wear and tear.

¶ 5        The taxicab lease agreement provided that nothing therein created or implied the existence of an employer-employee or principal-agent relationship between Grand and Allamuradov. The agreement referred to Allamuradov as a "self-employed businessperson, free from authority and control" of Grand.

¶ 6        After her assault, McNerney initially filed a complaint against 303, Stellar Transportation, Inc. (Stellar), and Allamuradov, individually and as agent and servant of 303 and/or Stellar. McNerney then filed a nine-count amended complaint, which added Grand as a defendant, alleging assault and battery, negligence, and negligent hiring, supervision, and training. Stellar was subsequently dismissed from the action because Grand, and not Stellar, leased the taxicab to Allamuradov.

¶ 7        Grand and 303 filed answers to the amended complaint and motions for summary judgment. Grand argued, among other things, that there was no agency relationship between Grand and Allamuradov, that his alleged conduct was not within the scope of any purported agency, that Grand was not a common carrier and thus did not owe any heightened duty of care, and that federal law prohibits vicarious liability for a commercial lessor of a vehicle for the actions of its lessee. Grand further contended that there was no evidence that it negligently hired, supervised, or trained Allamuradov. The attachments to its motion for summary judgment included the deposition testimony of Sergey Rapoport and McNerney.

¶ 8        Although compensated by another company, Rapoport performed work as a manager for Grand, a taxicab leasing company in operation since the beginning of 2012.[1] Rapoport also worked as a driver coordinator for 303. He testified that Allamuradov was referred to Grand by another driver. Other than his driver's license, Allamuradov did not provide any other form of identification at the time he leased the taxicab. Allamuradov did not provide a social security number, and Rapoport was unaware of any alternative name or alias he may have used.[2] Rapoport did not request references nor did he communicate with Allamuradov's prior employers.

¶ 9        Grand did not perform a background check on Allamuradov prior to entering into the taxicab lease agreement. Although Allamuradov made payments pursuant to the lease agreement, he was not required to provide a credit card. He paid Grand a fixed weekly fee that was not contingent upon his earnings. Grand did not issue him a 1099 and did not require him to drive the taxicab during any particular hours (or at all), nor did it require that he record or report his fares.

¶ 10       Rapoport further testified that the taxicab driven by Allamuradov was "affiliated with" 303, meaning that Grand had purchased dispatch services and licensed 303's trademarks. 303 did not lease vehicles. Although Grand did not have a relationship with dispatch service companies other than 303, individual drivers could utilize the services of other companies. If 303 was contacted by a party requesting a taxicab, it relayed the request to all taxicabs affiliated with 303 whose operators had chosen to "book into" the terminal.

¶ 11       Although Allamuradov initially denied any wrongdoing, Rapoport, after learning of the incident with McNerney, terminated his lease and required the return of the taxicab. In March

---

[1]Although he denied ever serving as vice president of Grand during his deposition, Rapoport averred that he was the vice president in an earlier affidavit.

[2]Both Rapoport and Baqthiar Khan (discussed below) were questioned by McNerney's counsel regarding a particular name, suggesting that Allamuradov had utilized that name.

2014, Allamuradov met with Rapoport to inquire whether he could again lease a taxicab from Grand. Rapoport denied Allamuradov's request.

¶ 12　　During his September 2014 deposition, Rapoport testified that Grand leased out between 20 to 30 taxicabs at any given time, some of which were equipped with surveillance systems, which were installed by the individual drivers. According to Rapoport, Grand viewed its "customers" as the lessees of the taxicabs, not the passengers in the vehicles. Rapoport also testified that Grand did not market itself as a provider of taxi services to the general public.

¶ 13　　A portion of McNerney's deposition testimony was appended to Grand's motion for summary judgment. She testified that she began using 303 in 2002, based on the recommendation of her former in-laws. Her former husband also "swore by 303." Prior to her assault, she had used 303 taxicabs exclusively in the Chicagoland area. Although she did not pay attention to the logos on the exterior of 303 taxicabs, she was aware of their white and turquoise colors.

¶ 14　　On August 22, 2012, McNerney requested a taxicab for the following morning through 303's online ordering website. She subsequently called 303 to change her pick-up time. When Allamuradov arrived at McNerney's residence in Winnetka, Illinois, at 4 a.m. on August 23, 2012, she received a telephone call and a text message from 303. While traveling to the airport, Allamuradov stopped the taxicab in a deserted area of Northbrook, Illinois, and insisted that McNerney move to the front seat. Despite her objections and her attempts to thwart him, he engaged in unwanted sexual and physical contact with her. She was able to surreptitiously record portions of the assault using her mobile telephone. Allamuradov subsequently confessed and pled guilty to battery.

¶ 15　　McNerney testified that she had not heard of Grand prior to the incident. She further testified that she had no "special relationship" with 303 except that its telephone number was programmed into her telephone. Although she "used to trust it," 303 never made any representations or guarantees to her. She was not aware that the taxicab drivers who utilized 303 were independent contractors.

¶ 16　　Like Grand, 303 in its motion for summary judgment argued that it had no employment or agency relationship with Allamuradov and that his actions were outside the scope of any alleged agency. 303 also asserted that it did not hire Allamuradov and that its orientation for Allamuradov regarding the workings of the dispatch system did not constitute negligent training. The attachments to 303's motion included the deposition testimony of Rapoport, McNerney, and Baqthiar Khan.

¶ 17　　Khan testified that he was employed by 303 as a driver coordinator. He explained that certain vehicles that utilized 303's dispatch services were operated by the owners of the vehicles. Other affiliates which utilized 303's dispatch services owned multiple vehicles. Khan's responsibilities included introducing drivers to 303's affiliates, including Grand.

¶ 18　　In his testimony, Khan provided that 303 handles dispatch services in the suburbs of Chicago and a "sister company" provides services in Chicago. When a customer calls for a taxicab, 303 checks the location. If certain taxicabs are licensed for a particular municipality, they are prioritized for that pick-up. Pursuant to the dispatch services agreement, 303 had established requirements regarding the vehicles used by Grand, *i.e.*, a four-door, full-sized, air-conditioned taxicab, painted certain colors to represent 303, with a toplight, a calibrated meter, and a functioning radio receiver. Khan confirmed that "[t]he cab itself says that the

cab is an affiliate of 303 Taxi but owned by someone else." According to Khan, the logos on the taxicabs are required by the city and/or state.

¶ 19    Khan further testified that the drivers are independent contractors. 303 does not dictate how many hours the driver works and does not require that the driver provide trip logs or work in a particular geographic location. 303 neither pays the driver nor withholds taxes. 303 also does not provide for repairs nor limits whether the driver may use the taxicab for personal purposes. A driver such as Allamuradov may choose to log into or out of the 303 terminal and may otherwise solicit passengers in whatever legally-permissible manner he chooses.

¶ 20    According to Khan, Grand periodically met with drivers at 303's offices, and Allamuradov went to 303's office in June 2012 with a friend who was already driving for Grand. At this initial meeting, Allamuradov provided an information sheet, his driver's license, his social security number, and a driving abstract from the State of Illinois that would have listed any moving violations. Approximately one week later, Allamuradov returned to the office to lease a taxicab from Grand.

¶ 21    Although not mandated by 303, most municipalities require a background check. Khan testified that the municipalities accepted background checks performed by a company called Accurate Biometrics. 303 initially provided Allamuradov with a form for Accurate Biometrics, and a 303 employee subsequently verified that Allamuradov had completed the background check—which was "clean"—and was fingerprinted, per the municipal requirements. 303 only informs an affiliate, such as Grand, if a background check reveals a red flag.

¶ 22    303 did not require references, an employment history, or verification that he lived at the address listed on his driver's license. Apart from the municipal requirements, 303 did not require that he disclose any prior criminal convictions.

¶ 23    303 provided training to Allamuradov pertaining to the operation of the taxi meter and the dispatch equipment. 303 also instructs drivers regarding customer service issues, *i.e.*, how to be courteous so as to maximize tips. Although drivers are advised to not discuss religion, politics, and sex, 303 provides no training to minimize the likelihood of sexual violence.

¶ 24    After the incident involving McNerney, the Northbrook police contacted 303 regarding Allamuradov's whereabouts. 303 ceased providing service to Allamuradov and informed him of his termination. Khan testified that he was unaware of any changes to 303's policies or procedures after the incident. He was also not aware of any sexual assaults committed by taxicab drivers prior to the assault on McNerney, but testified that another driver was subsequently accused of sexual assault.

¶ 25    Khan testified that if a customer calls regarding an issue with a vehicle, 303 contacts the driver to "tell them to stop by and we need to take a look at the [vehicle]." If a complaint is received regarding a driver, a notation on the 303 system is occasionally made. 303 has terminated dispatch services to repeatedly poor drivers. If dispatch services are terminated, a driver is nevertheless able to use the meter, pick up passengers, and take any other actions permitted by his license.

¶ 26    In her responses to the motions for summary judgment, McNerney included the affidavit of a purported common carrier expert, Ned Einstein. Einstein averred that taxicabs "have a significantly higher standard of care" than personal occupancy vehicles (*i.e.*, everyday

drivers) and transit national companies (TNCs) such as Uber and Lyft, which "merely sell a 'tool' " (an "app") that enables passengers to directly contact drivers. According to Einstein, operators of taxicab services within the Chicago metropolitan area, like 303 and Grand, are "proscribed by law from failing to monitor their drivers." Einstein also averred that state-of-the-art taxi systems contain GPS-oriented technology which enables a dispatcher to digitally track a taxicab's movement on and off routes.

¶ 27 Einstein opined that 303 and Grand are both common carriers and thus held to the highest duty and standard of care. According to Einstein, 303 and Grand controlled Allamuradov's conduct and performance as a taxicab driver during the incident, which occurred in the course and scope of his duty.

¶ 28 McNerney also submitted her own affidavit, which was executed after her deposition. McNerney averred that for 12 years she exclusively ordered taxicabs from 303 and had relied on 303 to keep her safe when using its services. She stated that she fully trusted 303's reputation for safety. McNerney assumed the driver was employed by 303 and that 303 had screened and trained drivers who would keep her safe and not attack her.

¶ 29 McNerney further averred that she never spoke with Allamuradov during the process of ordering the taxicab. According to McNerney, every taxicab she had ever ordered from 303 was painted turquoise and white and prominently featured 303's logo and telephone number on its exterior. She stated that she would not have used 303 had she known that "303 Taxi does not monitor the whereabouts of its cab drivers or request references, employment history or even social security numbers."

¶ 30 Having received all of the briefs and all other supporting documents, the circuit court entered an order on August 20, 2015, setting the matter for ruling on September 25, 2015. Prior to the circuit court issuing its ruling, 303 filed a four-count cross-claim against Grand and Allamuradov. In the cross-claim, 303 alleged, in part, that on the date of the incident with McNerney, Allamuradov "was acting within the scope of his employment as the agent and servant of [Grand]." 303 further alleged that Grand owed "the highest duty of care" to provide a safe environment for the patrons of its taxicabs.

¶ 31 On September 15, 2015, McNerney filed a motion for leave to supplement the record with newly discovered facts. According to the motion, McNerney's counsel on August 26, 2015, had submitted a Freedom of Information Act (FOIA) request to the Winnetka police department. In response to the FOIA request, the Village of Winnetka provided a blank license application on that date and a redacted copy of Allamuradov's license application on August 28, 2015. On the license application, Allamuradov identified 303 as the "Name of Employer or Business."[3] Because the application requested a letter from the cab company, verifying Allamuradov's employment or a copy of his identification card, McNerney posited that 303 had "provided a letter to the Winnetka Police Department verifying [Allamuradov's] employment and/or agency."[4] McNerney requested leave to supplement the record with the Winnetka documents and 303's cross-claim.

¶ 32 In a memorandum opinion and order entered on September 25, 2015, the circuit court granted Grand's and 303's motions for summary judgment. The order included an Illinois Supreme Court Rule 304(a) finding that there was no just reason to delay the enforcement or

---

[3]Allamuradov appears to have written "Cab 303 Taxi School Servese [*sic*]."

[4]No such letter, however, is included in the record on appeal.

appeal of the order. Ill. S. Ct. R. 304(a) (eff. Feb. 26, 2010). On October 27, 2015, one day after the deadline, McNerney's counsel electronically filed a motion for reconsideration of the order granting summary judgment to 303 and Grand. Although the circuit court's memorandum opinion and order of November 12, 2015, permitted the retroactive filing of McNerney's motion for reconsideration, the motion was denied.

¶ 33   After a hearing, the circuit court on October 2, 2015, denied McNerney's motion for leave to supplement the record. The circuit court noted that all discovery had closed on May 20, 2015. The circuit court had also ordered that materials submitted after the scheduling of the ruling date—August 20, 2015—would not be accepted or considered in rendering its ruling. In an order entered on November 12, 2015, the court denied McNerney's motion to reconsider the denial of her motion for leave to supplement the record.

¶ 34   McNerney filed a notice of appeal on December 9, 2015, and an amended notice of appeal on December 11, 2015. Grand and 303 filed separate notices of cross-appeal on December 18, 2015, challenging the order permitting the retroactive filing of McNerney's motion for reconsideration of the grant of summary judgment.

¶ 35                              II. ANALYSIS

¶ 36   McNerney argues that the circuit court erred in granting summary judgment in favor of Grand and 303 and that she pled sufficient facts to create a triable issue of apparent authority. McNerney further asserts that the circuit court erred in denying her motion to supplement the record. In their cross-appeals, Grand and 303 argue that this court lacks jurisdiction over McNerney's appeal because her motion for reconsideration was not timely filed in the circuit court. As the cross-appeals challenge our jurisdiction, we shall address this issue first.

¶ 37                    A. Grand's and 303's Cross-Appeals

¶ 38   The circuit court entered a memorandum opinion and order on September 25, 2015, granting summary judgment in favor of Grand and 303. The order included a Rule 304(a) finding that there was no just reason to delay the enforcement or appeal of the order. Ill. S. Ct. R. 304(a) (eff. Feb. 26, 2010). Pursuant to section 2-1203 of the Code of Civil Procedure (735 ILCS 5/2-1203 (West 2014)), McNerney had 30 days to file a motion for reconsideration of the order granting summary judgment. Since the 30th day was a Sunday, her motion was due on Monday, October 26, 2015. See 5 ILCS 70/1.11 (West 2014).

¶ 39   McNerney's counsel electronically submitted her motion to reconsider on October 26, 2015, at 11:30 p.m. At that time, her counsel paid a filing fee of $7.90, which was the amount that the e-filing system purportedly prompted counsel to pay. At 4:08 p.m. on the following day, her counsel received an electronic notice of rejection. The motion was rejected because the proper filing fee of $60 was not paid.[5] After contacting the office of the clerk of the circuit court, McNerney's counsel refiled the motion electronically on October 27, 2015, and paid the full filing fee. McNerney then filed a motion for an order *nunc pro tunc*, requesting that her motion be considered timely filed. The circuit court subsequently held that the motion to reconsider shall be deemed timely filed, retroactive to October 26, 2015, at 11:30 p.m.

_____

[5]The circuit court order indicates that the fee is $60 for motions filed within 30 days and $90 for motions filed after 30 days.

¶ 40    The parties disagree regarding the applicable standard of review. Grand and 303 argue that a *de novo* standard of review applies to this jurisdictional matter. See, *e.g.*, *Gardner v. Mullins*, 234 Ill. 2d 503, 508 (2009) (stating that whether the appellate court has jurisdiction to consider an appeal presents a question of law which we review *de novo*). McNerney contends that the proper standard of review is an abuse of discretion. See, *e.g.*, *Draper & Kramer, Inc. v. King*, 2014 IL App (1st) 132073, ¶ 26. Regardless of the applicable standard of review, our result herein remains the same.

¶ 41    Illinois Supreme Court Rule 21(c) authorizes the chief judge of the circuit court to enter general orders in the exercise of his or her general administrative authority. Ill. S. Ct. R. 21(c) (eff. Dec. 1, 2008). Cook County Circuit Court General Administrative Order 2014-02 (eff. Jan. 1, 2013; amended Sept. 16, 2014) addresses the electronic filing of court documents. The administrative order provides that filers should attempt to resolve filing errors based on technical failures, such as rejection by the clerk's office. If unable to resolve the problem, the aggrieved filer may seek relief from the court. Pursuant to the administrative order, the court, in its discretion, may enter an order *nunc pro tunc* to resolve the filing discrepancy (Cook Co. Cir. Ct. Gen. Adm. Order 2014-02(6)).

¶ 42    We agree with the circuit court that the language of the general administrative order permits the entry of an order resolving this issue, which arose from an error in the e-filing process. The general administrative order provides that the circuit court may enter an order *nunc pro tunc* within its discretion, and neither Grand nor 303 have provided any evidence that the circuit court abused its discretion herein. See also *Ayala v. Goad*, 176 Ill. App. 3d 1091, 1095 (1988) (concluding that a complaint was timely filed despite the clerk having accepted it for filing without the required fee). As the motion to reconsider was properly deemed to have been timely filed, the challenge to our jurisdiction raised by Grand and 303 must fail.

¶ 43                              B. McNerney's Appeal
¶ 44                          1. Denial of Motion to Supplement
¶ 45    We next address McNerney's contention that the circuit court erred in denying her motion to supplement the record with "newly discovered facts." McNerney sought to supplement the record and her responses to the motions for summary judgment with 303's cross-claim and evidence that (1) Allamuradov identified 303 as his "employer" and/or "business" on the taxicab license application which he submitted to the Village of Winnetka, (2) the Village requires a letter from cab companies verifying the employment of their drivers who apply for a taxicab license, and (3) the Village granted Allamuradov's license application.

¶ 46    We initially note McNerney's reliance on section 2-1005 and 2-616 of the Code of Civil Procedure (Code) is misplaced. See 735 ILCS 5/2-1005, 2-616 (West 2014). For example, section 2-1005(g) permits "pleadings" to be amended upon just and reasonable terms before or after the entry of a summary judgment. 735 ILCS 5/2-1005(g) (West 2014). Her motion to supplement, however, does not seek an amendment of a "pleading." See, *e.g.*, *In re Marriage of Wolff*, 355 Ill. App. 3d 403, 407 (2005) (distinguishing a "pleading," which "consists of a party's formal allegations of his claims or defenses," from a "motion," which is an "application to the court for a ruling or an order in a pending case"). Although both section 2-1005(g) and section 2-616(a) address amendments, neither statutory section uses the word

- 8 -

"supplement." As previously stated, neither provision of the Code provides for the supplementing of a pleading. 735 ILCS 5/2-1005(g), 2-616(a) (West 2014).

¶ 47    In any event, even if plaintiff had properly set forth her motion to amend, the granting or denying of a motion for leave to amend pursuant to section 2-616 lies in the discretion of the trial court and the exercise of that discretion will be reversed only on a finding that the discretion has been abused. *Clemons v. Mechanical Devices Co.*, 202 Ill. 2d 344, 351 (2002). The discretion of the trial court has been described by the Illinois Supreme Court as "broad" and subject to reversal only if the abuse is "manifest." *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273-74 (1992). As we set forth below, the trial court in this case did not abuse its discretion in denying McNerney's motion. McNerney's attempt to supplement the record and her responses to the motions for summary judgment by utilizing section 2-616 was misplaced.

¶ 48    First, we reject McNerney's contention that her motion to supplement was timely. McNerney submitted her FOIA request to the Village in late August 2015—months after discovery was closed in this case. The circuit court had entered an order expressly providing that documents submitted after a specified date would not be considered in its summary judgment ruling. Furthermore, McNerney did not timely raise any concerns regarding the deadlines imposed by the circuit court with respect to the motions for summary judgment.

¶ 49    Second, we are also puzzled by McNerney's assertion that 303 had a duty to produce the documents that she obtained via the FOIA request. As Allamuradov appears to have completed the license application himself, there is no indication that 303 was aware of his responses therein. Even assuming that 303 was aware, McNerney has provided no support for the proposition that 303 would be legally bound by Allamuradov's responses. Although McNerney posits that the approval of his license application inherently means that 303 submitted a verification letter to the Village, neither the Village nor 303 have produced such a letter.[6]

¶ 50    Third, we further note that McNerney's utilization of the term "supplement" is inaccurate, given that Allamuradov's application was submitted to and approved by the Village years before the motions for summary judgment were filed. Section 2-609 provides that "[s]upplemental pleadings, setting up matters which arise after the original pleadings are filed, may be filed within a reasonable time by either party." 735 ILCS 5/2-609 (West 2014); *Bentley v. Hefti*, 2015 IL App (4th) 140167, ¶ 16. The purpose of the provision is to bring before the court facts which came into existence after the original complaint was filed. *Kovac v. Kovac*, 26 Ill. App. 2d 29, 48 (1960). See also *Petrella v. Leisky*, 92 Ill. App. 3d 880, 881 (1981) (noting that the label "[s]upplemental [c]ounts" was "not correct because supplemental pleadings are employed to set forth matters arising after the original pleading has been filed").

¶ 51    For the reasons discussed above, we affirm the circuit court's denial of the motion to supplement. We further conclude that the circuit court properly denied McNerney's motion to reconsider the denial of her motion for leave to supplement. The purpose of a motion to reconsider is to bring to the court's attention newly discovered evidence that was not available at the time of the original hearing, changes in existing law, or errors in the court's

---

[6]We observe, however, that a notation on the application suggests that the Village did, in fact, receive a verification letter or copy of Allamuradov's identification card.

application of the law. *Evanston Insurance Co. v. Riseborough*, 2014 IL 114271, ¶ 36. None of the foregoing circumstances were present in the instant case.

¶ 52 As discussed below, we are reversing the circuit court order granting summary judgment and remanding this matter for additional proceedings. Given that the discovery deadlines have passed, the circuit court may make any necessary discovery-related determinations it deems necessary on remand. See, *e.g.*, *Avery v. Sabbia*, 301 Ill. App. 3d 839, 845 (1998) (noting that the "trial court is in the best position to weigh fairly the competing needs and interests of parties affected by the discovery").

¶ 53                    2. Grant of Summary Judgment in Favor of Defendants

¶ 54 McNerney also challenges the grant of summary judgment in favor of Grand and 303. Summary judgment is proper when the pleadings, depositions, admissions, and affidavits on file show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *1010 Lake Shore Ass'n v. Deutsche Bank National Trust Co.*, 2015 IL 118372, ¶ 20; 735 ILCS 5/2-1005(c) (West 2014). "Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Seymour v. Collins*, 2015 IL 118432, ¶ 42. We review a trial court's grant of summary judgment *de novo*. *1010 Lake Shore Ass'n*, 2015 IL 118372, ¶ 20.

¶ 55 At common law, an employee's malfeasance may generally create liability for his or her employer in two ways: direct liability for the employer's own acts or vicarious liability for the acts of the employee. *Vancura v. Katris*, 238 Ill. 2d 352, 375 (2010). In her amended complaint, McNerney alleges Grand and 303 are directly liable based on their own acts, *i.e.*, negligent hiring, supervision, and training of Allamuradov. McNerney also alleges that Grand and 303 are vicariously liable for the assault and battery committed by Allamuradov and for his negligence, *e.g.*, that he "[c]arelessly and negligently attempt[ed] to engage in unprovoked and unwarranted sexual behavior" with McNerney. We address these claims below.

¶ 56                    a. Negligent Hiring, Supervision, and Training

¶ 57 Illinois courts have recognized a cause of action against an employer for negligently hiring, or retaining in its employment, an employee it knew, or should have known, was unfit for the job so as to create a danger of harm to third persons. *Van Horne v. Muller*, 185 Ill. 2d 299, 310 (1998). An action for negligent hiring or retention of an employee requires the plaintiff to plead and prove that (1) the employer knew or should have known that the employee had a particular unfitness for the position so as to create a danger of harm to third persons, (2) such particular unfitness was known or should have been known at the time of the employee's hiring or retention, and (3) this particular unfitness proximately caused the plaintiff's injury. *Id.* at 311. "Under a theory of negligent hiring or retention, the proximate cause of the plaintiff's injury is the employer's negligence in hiring or retaining the employee, rather than the employee's wrongful act." *Id.*

¶ 58 Although Grand and 303 assert that they neither hired nor employed Allamuradov, Illinois courts have recognized a cause of action based on the negligent hiring of an independent contractor. See, *e.g.*, *Hayward v. C.H. Robinson Co.*, 2014 IL App (3d) 130530, ¶ 35. As stated in *Strickland v. Communications & Cable of Chicago, Inc.*, 304 Ill. App. 3d

- 10 -

679, 682 (1999), a "defendant may be liable for negligent hiring whether the person was retained as an employee or an independent contractor."

¶ 59   The defendants further contend that McNerney does not point to any evidence in Allamuradov's background that would have alerted them to his particular unfitness to be a taxicab driver, *i.e.*, the government-required background check performed by Accurate Biometrics did not reveal any red flags. Grand's counsel represented during oral argument that if an individual cannot obtain a chauffeur's license, he would not be permitted to drive for Grand.

¶ 60   While we recognize that the Village and other municipalities impose requirements prior to granting a license to operate a taxicab, we do not consider the existence of such requirements as necessarily absolving companies like Grand or 303 from conducting a more thorough investigation into a prospective driver's background. See, *e.g.*, *Workplace Trends*, 27 No. 6 Ill. Emp. L. Letter (BLR) 4 (Jan. 2017) (noting that employers that conduct background checks "analyze for the following aspects: criminal background (82%), confirm employment (62%), confirm identity (60%), confirm education (50%), check for illegal drug use (44%), check licensing (38%), and check credit (29%)"). See also *Malorney v. B&L Motor Freight, Inc.*, 146 Ill. App. 3d 265, 267-68 (1986) (discussing the duties "imposed by law on owners of vehicles who permit or hire other persons to drive on our highways," including a duty to deny the entrustment of a vehicle to a driver it knows or should have known is incompetent). Grand does not require drivers to provide references or an employment history. Allamuradov was required to provide only a minimal amount of information, *e.g.*, his driver's license and his driving record report, for the "Independent Contractor Information Sheet" completed by 303. Although we recognize that the background check conducted by Accurate Biometrics did not reveal any red flags, we cannot state as a matter of law that such an examination was sufficient, particularly given the high duty of care imposed on common carriers, as discussed below. See, *e.g.*, *Przybylski v. Yellow Cab Co.*, 6 Ill. App. 3d 243, 246 (1972) (noting that the defendant-taxicab company, as a common carrier, owed the plaintiff-passenger "the duty to use the highest degree of care consistent with the mode of conveyance and the practical operation thereof, and was responsible for any departure from that high standard"). We thus conclude that summary judgment in favor of the defendants was not proper with respect to McNerney's negligent hiring claims.

¶ 61   To state a cause of action for negligent supervision, the plaintiff must establish that (1) the employer had a duty to supervise its employee, (2) the employer negligently supervised its employee, and (3) such negligence proximately caused the plaintiff's injuries. *Lansing v. Southwest Airlines Co.*, 2012 IL App (1st) 101164, ¶ 22. The existence of a duty is a question of law. *Id.* Whether a defendant has a duty to train its employees is also best analyzed under principles generally applicable to negligence cases. *Vancura*, 238 Ill. 2d at 383; *National R.R. Passenger Corp. v. Terracon Consultants, Inc.*, 2014 IL App (5th) 130257, ¶ 15. " 'The touchstone of the duty analysis is to ask whether the plaintiff and defendant stood in such a relationship to one another that the law imposes on the defendant an obligation of reasonable conduct for the benefit of the plaintiff.' " *Vancura*, 238 Ill. 2d at 383 (quoting *Krywin v. Chicago Transit Authority*, 238 Ill. 2d 215, 226 (2010)). "The inquiry involves four factors: (1) the reasonable foreseeability of the injury; (2) the likelihood of the

injury; (3) the magnitude of the burden of guarding against the injury; and (4) the consequences of placing the burden on the defendant." *Id.*

We reject the contention that neither Grand nor 303 owed a duty to supervise or train Allamuradov because neither was his employer. We are hard-pressed to conclude that, because of the business structure crafted by Grand and 303, neither company owes any duty to passengers like McNerney to supervise the conduct of their drivers. See, *e.g.*, *Grinyov v. 303 Taxi, L.L.C.*, 2017 IL App (1st) 160193, ¶ 45 (finding no error where a defendant-taxicab owner introduced testimony regarding the payments it made to its co-defendant 303 to create an "inference that [303] exercised leverage and control over [the owner] to create an agency relationship"). 303 further contends that, although it provided training regarding the dispatch system, there is no evidence that its purported failure to properly train or supervise Allamuradov caused his assault on McNerney. See, *e.g.*, *Dennis v. Pace Suburban Bus Service*, 2014 IL App (1st) 132397, ¶ 26 (stating that the "plaintiff alleged no facts as to how Pace's failure to employ procedures dictating how its drivers handled incapacitated passengers proximately caused [the driver] to sexually assault plaintiff"). We are uncertain, however, whether training regarding sexual assault prevention or whether supervision in the form of cameras, GPS tracking, or other measures could have prevented the assault on McNerney. Although we share the circuit court's assessment that Einstein's affidavit "is replete with legal conclusions rather than facts," his representations regarding the available technology suggests a factual question as to what a taxicab company could or should do to lessen the likelihood of an assault on a passenger. For the foregoing reasons, we reverse the grant of summary judgment in favor of Grand and 303 on McNerney's claims of negligent hiring, supervision, and training.

### b. Assault and Battery Claims and Negligence Claims

We next consider McNerney's claims of assault and battery and negligence. According to McNerney, vicarious liability is demonstrated because a principal/agent relationship existed between Grand and Allamuradov and between 303 and Allamuradov. An agency is a fiduciary relationship in which the principal has the right to control the agent's conduct and the agent has the power to act on the principal's behalf. *Amcore Bank, N.A. v. Hahnaman-Albrecht, Inc.*, 326 Ill. App. 3d 126, 134 (2001); *Hirst v. Stackowski*, 202 Ill. App. 3d 718, 721 (1990). See also *Sperl v. C.H. Robinson Worldwide, Inc.*, 408 Ill. App. 3d 1051, 1057 (2011) (noting that an agency is a consensual relationship in which a principal has the right to control an agent's conduct and an agent has the power to affect a principal's legal relations). Although the existence of an agency relationship is typically a question of fact, it becomes a question of law when the facts regarding the relationship are undisputed or no liability exists as a matter of law. *Daniels v. Corrigan*, 382 Ill. App. 3d 66, 75 (2008). The burden of proving the existence of an agency relationship and the scope of authority is on the party seeking to charge the alleged principal. *Id.*

An agent's authority may be actual or apparent. *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 34. "Actual agency consists of a principal/agent, master/servant, or employer/employee relationship and the principal's control or right to control the conduct of the agent, servant, or employee." *Jacobs v. Yellow Cab Affiliation, Inc.*, 2017 IL App (1st) 151107, ¶ 64. Apparent agency liability occurs when a purported principal has created the appearance that someone is his or her agent, and an innocent third

party has reasonably relied on such appearance to his or her detriment. *Id.*

¶ 66                                i. Actual Authority

¶ 67    The doctrine of *respondeat superior* allows an injured party to hold a principal vicariously liable for the conduct of its agent. *Daniels*, 382 Ill. App. 3d at 75. "Proof of actual agency, or *respondeat superior*, requires a showing that (1) a principal/agent, master/servant, or employer/employee relationship existed; (2) the principal controlled or had the right to control the conduct of the alleged employee or agent; and (3) the alleged conduct of the agent or employee fell within the scope of the agency or employment." *Wilson v. Edward Hospital*, 2012 IL 112898, ¶ 18.

¶ 68    As a general rule, no vicarious liability exists for the actions of independent contractors. *Grinyov*, 2017 IL App (1st) 160193, ¶ 26. See also *Sperl*, 408 Ill. App. 3d at 1057 (noting that a principal is vicariously liable for the conduct of its agent but not for the conduct of an independent contractor). An independent contractor relationship is one in which an independent contractor undertakes to produce a given result but, in the actual execution of the work, is not under the orders or control of the person for whom he does the work. *Id.*

¶ 69    Both Grand and 303 have characterized Allamuradov as an independent contractor, and the taxicab lease agreement expressly provides for this relationship. Our supreme court has stated, however, that the label of "independent contractor" does not bar the attachment of vicarious liability if the party is also an agent. *Horwitz v. Holabird & Root*, 212 Ill. 2d 1, 13 (2004). See also *Grinyov*, 2017 IL App (1st) 160193, ¶ 26. Furthermore, the declaration of the parties is not controlling where the conduct of the parties demonstrates the existence of an agency relationship. *Daniels*, 382 Ill. App. 3d at 75. Specific conduct can demonstrate by inference the existence of an agency relationship, despite contractual evidence that the parties intended an independent contractor relationship. *Sperl*, 408 Ill. App. 3d at 1057.

¶ 70    No one factor determines what the relationship is between the parties. Some courts have considered factors such as the right to control the manner in which the work is done, the method of payment, the right to discharge, the skills required in the work to be done, and who provides the tools, materials, or equipment. *Davila v. Yellow Cab Co.*, 333 Ill. App. 3d 592, 596 (2002). Although no single factor is determinative, the right to control the manner in which the work is performed is considered to be the most important factor. *Dowe v. Birmingham Steel Corp.*, 2011 IL App (1st) 091997, ¶ 30; accord *Davila*, 333 Ill. App. 3d at 596. In addition, courts have stated that the right of control, not the fact of control, is the principal factor in distinguishing a servant from a contractor. *Dowe*, 2011 IL App (1st) 091997, ¶ 30.

¶ 71    In cases involving taxicab drivers, particular weight has been given to the following factors in determining the issue of control of the manner in which the work is done: (1) whether the driver accepted radio calls from the company, (2) whether the driver had his radio and cab repaired by the company, (3) whether the vehicles were painted alike with the name of the company and its telephone number on the vehicle, (4) whether the company could refuse the driver a cab, (5) whether the company had control over work shifts and assignments, (6) whether the company requires that gasoline be purchased from the company, (7) whether repair and tow services are supplied by the company, (8) whether the company has the right to discharge the driver or cancel the lease without cause, and (9) whether the lease contains a prohibition against subleasing the taxicab. *Yellow Cab Co. v.*

*Industrial Comm'n*, 238 Ill. App. 3d 650, 653 (1992), *overruled by West Cab Co. v. Industrial Comm'n*, 376 Ill. App. 3d 396, 405 (2007).

¶ 72    As to Grand, certain of the foregoing factors are present. Grand acknowledges that all of its taxicabs were painted alike, with 303's color scheme, logo, and telephone number, in accordance with the dispatch services agreement. In addition, the taxicab lease agreement provided that Allamuradov could sublease the taxicab only upon the prior written approval of Grand. Furthermore, although Grand did not force drivers to utilize 303's radio dispatch services, Khan testified that affiliates such as Grand could contact him to discontinue dispatch services, *e.g.*, if there were customer complaints. The agreement further provided that Grand, at its sole discretion, could replace Allamuradov's taxicab with another taxicab. Based on the foregoing factors, we cannot conclude as a matter of law that no agency relationship existed between Grand and Allamuradov.

¶ 73    We reach the same result as to 303. Although marked as an "affiliate" of 303, according to Khan's testimony, the taxicab was painted with the 303 logo and colors. Although he was not required to log into the dispatch system or to answer any call, Allamuradov was provided dispatch services through 303. While 303 narrowly characterizes itself as the provider of dispatch services, the record suggests that 303 plays a more active role in taxicab operations. For example, given the interconnected relationship between Grand, 303, and taxicab drivers,[7] it appears that a driver's noncompliance with the restrictions imposed by Grand or 303 could result in the termination of dispatch services and/or the taxicab lease. The record suggests that 303 played a role in the recruitment, screening, orientation, retention, performance management, discipline, and termination of drivers.

¶ 74    Based on the foregoing, material questions of fact exist as to whether Allamuradov was an agent of Grand and 303. We conclude that the evidence that no agency relationships existed is insufficient as a matter of law.

¶ 75    Under the doctrine of *respondeat superior*, a principal or employer can be held liable for the acts committed by an agent or employee acting within the scope of his agency or employment. See, *e.g.*, *Lang v. Silva*, 306 Ill. App. 3d 960, 972 (1999). A taxicab, however, is a common carrier (*e.g.*, *Przybylski*, 6 Ill. App. 3d at 246), and a common carrier may be liable for intentional acts even if committed outside of the scope of employment. *Dennis*, 2014 IL App (1st) 132397, ¶ 18. A common carrier serves all of the public alike, whereas a private carrier only serves certain persons by special agreement in particular instances. *Doe v. Sanchez*, 2016 IL App (2d) 150554, ¶ 11. During oral argument, Grand's counsel acknowledged the company's likely status as a common carrier. Given 303's role in coordinating the operations of the taxicab system, 303 is also likely to be considered a common carrier.

¶ 76    Illinois courts recognize that common carriers owe a heightened duty of care. *Id.* ¶ 55. The high duty of care owed by a common carrier to its passengers is "premised on the carrier's unique control over its passengers' safety." *Id.* ¶ 39. As stated in *Green v. Carlinville Community Unit School District No. 1*, 381 Ill. App. 3d 207, 213 (2008), "if an

---

[7]For example, a recent decision of this court in an unrelated case identifies Rapoport as a 303 employee. *Grinyov*, 2017 IL App (1st) 160193, ¶ 11. Under the dispatch services agreement, Grand agreed to indemnify 303 for various liabilities, including damages resulting from "the acts or omissions of Operators or [Grand's] employees or agents."

employee of a common carrier intentionally injures a passenger, the common carrier is liable for the passenger's injuries, even if the employee's actions were not in his actual or apparent scope of authority."

¶ 77    Not all courts have relied on the doctrine of *respondeat superior* in finding liability. In *Doe v. Sanchez*, 2016 IL App (2d) 150554, ¶ 2, a school bus driver employed by a private contractor was accused of inappropriately touching a student. After the circuit court denied the contractor's motion to dismiss, two certified questions were presented to the appellate court: whether the private contractor should be held to the same standard of care as a common carrier and whether it could be vicariously liable for the actions of its employee committed outside the scope of employment. *Id.* ¶ 3. The appellate court answered both questions in the affirmative. *Id.* ¶ 4. As to the second question, the appellate court noted that it was not relying on a theory of *respondeat superior*, but instead relied on a "common carrier's nondelegable duty." *Id.* ¶ 46. Stating that "Illinois courts recognize that a common carrier's high duty of care is a nondelegable duty," the *Sanchez* court concluded that an employer with a nondelegable duty of care is liable for an employee's misconduct outside the scope of employment. *Id.* ¶ 52.

¶ 78    Whether we rely on the theory of *respondeat superior* or the concept that a common carrier's high duty of care is non-delegable, our result herein is the same. We cannot conclude that Grand's or 303's right to judgment is "clear and free from doubt." *Seymour*, 2015 IL 118432, ¶ 42.

¶ 79                              ii. Apparent Authority

¶ 80    The order granting summary judgment also rejected McNerney's contention that there was a question of fact as to 303's apparent agency.[8] On appeal, she argues that "Allamuradov appeared to be an agent of 303, as 303 held itself out as the principal of Allamuradov." 303 initially responds that McNerney did not plead the elements of apparent agency in her amended complaint. We note, however, that McNerney expressly raised her apparent authority argument in her response to 303's motion for summary judgment. Furthermore, our supreme court has stated that "actual agency and apparent agency are not causes of action" but instead are "merely part of the duty analysis in a case where the plaintiff seeks to hold the principal liable for the agent's alleged negligence." *Wilson*, 2012 IL 112898, ¶ 24 (addressing *res judicata* arguments). Even assuming that McNerney's apparent agency theory was not adequately pled, she could potentially amend her complaint to address any deficiency on remand. See, *e.g.*, *Plooy v. Paryani*, 275 Ill. App. 3d 1074, 1081 (1995) (permitting plaintiff to amend complaint to add apparent agency count shortly before jury deliberations). We thus consider her argument.

¶ 81    " 'Apparent authority in an agent is the authority which the principal knowingly permits the agent to assume, or the authority which the principal holds the agent out as possessing.' " *Jacobs*, 2017 IL App (1st) 151107, ¶ 31 (quoting *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 523 (1993)). In order to impose liability on the basis of apparent authority, a plaintiff need only demonstrate (1) that the principal held out the agent as having authority or knowingly acquiesced in the agent's exercise of authority, (2) based on the actions of the principal and agent, the third person reasonably concluded that an agency relationship

[8]McNerney does not raise any apparent authority argument with respect to Grand.

existed, and (3) the third person relied on the agent's apparent authority to her detriment. *Id.* (citing *Oliveira-Brooks v. Re/Max International, Inc.*, 372 Ill. App. 3d 127, 137 (2007)).

¶ 82 The apparent authority of an agent must be based on words and acts of the principal and not on anything the agent himself has said or done. *Graver v. Pinecrest Volunteer Fire Department*, 2014 IL App (1st) 123006, ¶ 17; accord *Jacobs*, 2017 IL App (1st) 151107, ¶ 32. "The manifestations by the apparent principal may be made directly to the third party or may be made to the community by signs or advertising." *Graver*, 2014 IL App (1st) 123006, ¶ 17. 303 advertises for passengers, as noted in *Grinyov*, 2017 IL App (1st) 160193, ¶ 4.

¶ 83 In the instant case, McNerney communicated exclusively with 303—and not Allamuradov—to arrange her taxicab ride to the airport. She used 303 based on her former relatives' recommendation and believed its drivers were screened by the company. The taxicab that appeared at her residence had the colors, logo, and telephone number of 303. McNerney averred that she would not have used 303 had she known that the company did not monitor the whereabouts of the cab drivers or request their employment history or references. We reject 303's contention that McNerney's affidavit contradicted her deposition testimony. Unlike in *Smith v. Ashley*, 29 Ill. App. 3d 932, 935 (1975), which is cited by 303—where the court noted that "a counteraffidavit does not place in issue material facts which were removed by a party's deliberate admission under oath"—McNerney's deposition testimony was not inconsistent with her subsequent affidavit.

¶ 84 The determination of apparent agency is generally not a question of law. *Jacobs*, 2017 IL App (1st) 151107, ¶ 79. Although the existence of an agency relationship may become a question of law when the facts regarding the relationship are undisputed or no liability exists as a matter of law, such is not the case herein. *Id.* Here, the purported principal—303—may have created the appearance that Allamuradov was its agent, and an innocent third party—McNerney—potentially relied on the apparent agency and was harmed as a result. There is sufficient evidence in the record to create a genuine issue of material fact as to the existence of apparent agency. Summary judgment in favor of 303 was thus improper with respect to any apparent agency claim.

¶ 85                                    III. CONCLUSION

¶ 86 For the foregoing reasons, the judgment of the circuit court of Cook County granting summary judgment in favor of Grand and 303 is hereby reversed, and the matter is remanded for additional proceedings consistent with this order.

¶ 87 Reversed and remanded.