MICHAEL A. SOBEL *et al.*, Plaintiffs-Appellants and Cross-Appellees, v. LEONARD H. FRANKS *et al.*, Defendants-Appellees and Cross-Appellants (Michael A. Sobel, Plaintiff-Counterdefendant and Cross-Appellee; Leonard H. Franks C.P.C.U. and Associates, Inc., Defendant-Counterplaintiff and Cross-Appellant).

First District (6th Division)  No. 1—92—3900

Opinion filed February 25, 1994.—Rehearing denied April 25, 1994.

672

Barnett, Bornstein & Blazer, Ltd., of Chicago (Harvey J. Barnett and John A. Fritchey IV, of counsel), for Michael A. Sobel and MAS Insurance Consultants, Inc.

Canel, Davis & King (Jay A. Canel and Peter M. King, of counsel) and Loretta M. Griffin, of O'Connor, Schiff & Myers, both of Chicago, for Leonard H. Franks and Leonard H. Franks C.P.C.U. & Associates, Inc.

JUSTICE McNAMARA delivered the opinion of the court:
On August 8, 1987, Michael A. Sobel and MAS Insurance

Consultants, Inc. (collectively referred to as Sobel), filed a complaint for accounting and other relief against Leonard H. Franks and Leonard H. Franks C.P.C.U. & Associates (collectively referred to as Franks). Sobel subsequently filed a first amended complaint at law. The matter proceeded to a jury trial on the following six counts: breach of an oral agreement, unjust enrichment, conversion, interference with anticipated economic relations, unfair competition and, against Leonard Franks, individually, participation in tortious acts. The trial also proceeded on the counterclaim of Franks against Sobel. At the close of Sobel's case, the trial court granted Franks' motion for directed verdict with respect to all counts. On his own motion, the trial judge dismissed Franks' counterclaim. Sobel's post-trial motion was subsequently denied by the trial court. Both parties appeal. The facts follow.

In September 1962, following his graduation from college, Sobel entered the insurance business, working at Franks' agency (the Agency) selling personal, life and commercial lines of insurance which were placed by Franks. The parties agreed that in exchange for Franks providing Sobel with a desk, office furniture, supplies and a telephone, the necessities of the business, Sobel would give Franks 50% of the gross commissions from every insurance policy that he solicited and sold. In the beginning, Franks personally trained Sobel by taking him on sales calls, giving him advice and sending him to seminars. After approximately six months, Franks hired and paid the Welcome Wagon to provide leads. After several years, they stopped using the Welcome Wagon because Sobel had a sufficient book of business and enough referrals and contacts of his own. Until December 1985, Franks was available to Sobel as a resource, helping him when asked.

In 1968, Franks' business was transferred to Leonard H. Franks C.P.C.U. & Associates, Inc. Sobel represented this entity until 1986 when he transferred his rights to MAS Insurance Consultants, Inc.

The accounts generated by Sobel were designated the "M Accounts," while those generated by Franks were captioned "L Accounts." The M Account clients made their premium payments to the Agency. Payments received for M Account policies were deposited into a separate account known as the M Account premium fund trust. From September 1962 to January 1987, a monthly statement was prepared, generally by Sobel, which reflected the commissions paid on that account as well as the proportional amount of expenses to be paid by Sobel and Franks. These statements were used to determine the amount of money owed to Sobel at the end of each month.

Initially, Franks provided Sobel with office space and paid for his support staff and business expenses. As Sobel's business grew, however, Sobel either paid for or shared additional expenses, including payroll for added employees, with Franks.

Throughout his association with Franks, Sobel considered himself to be a sole proprietor and consistently filled out his tax returns as such for the years 1962 to 1986. Franks' actions served to confirm Sobel's beliefs, where, in 1963, when Sobel asked Franks to help him prepare his tax return after their first year of association, Franks told him, "No, you are not a partnership, you're self-employed." Furthermore, at no time during their relationship did Franks withhold taxes from Sobel or supply him with a W-2 or 1099 form. In addition, Sobel paid 100% of his social security taxes.

In 1986, Sobel formed MAS Insurance Consultants, Inc. (MAS), transferring his rights to receive commissions to the corporation. Initially, Sobel's M Account business grew slowly, but by February 1987 it had flourished to over 800 customers. Sobel's business became so successful that in 1986, the M Account gross commissions were approximately $414,000. Although Sobel would lose an estimated 5% to 10% percent of his clients annually due to normal attrition, there was enough new business to offset the attrition such that his gross commissions continued to rise throughout the years 1962 to 1986. By the time his association with Franks had come to an end, Sobel had four to five employees with a gross payroll in excess of $60,000.

Although their relationship remained somewhat harmonious for approximately 22 years, certain points of contention arose between the parties by late 1985 regarding the commission split and the payment of related expenses. In late 1985, Sobel wanted to change the arrangement he had with Franks. Although Sobel and Franks negotiated over possible new terms, they did not reach an agreement.

When it became obvious that the parties could not resolve their differences, Franks told Sobel, "This is not going to work. I want you to leave. I want you to get out. I'll help you find another agency." They agreed to continue the relationship until Sobel found a new agency, but no later than December 1987. They also agreed that during this two-year period, neither of them would contact M Account clients to tell them of the proposed change. In fact, on January 23, 1987, Sobel wrote to Franks stating:

> "This will confirm that I intend to purchase within the next thirty days, your half interest in our joint account, commonly known as the 'M Account', on fair terms which are mutually satisfactory.

* * *

In the interim, I will not communicate our expected separation to the M Account clientele in the expectation that when the agreement is reached, a joint announcement will be sent out to accomplish an orderly transition."

This letter was admitted into evidence over objection, but was not given to the jury. At trial, counsel for Franks asked Sobel's expert, Tim Cunningham, a principal with Hales & Associates, a national financial and management consulting firm which deals exclusively with insurance agents and brokers, to read the letter to himself. The following exchange between them then took place:

"Q. If you had seen that letter prior to giving—to forming the opinion that you reached in this case, might your opinion have been different concerning the ownership of these accounts?

A. Maybe yes. Maybe no.

Q. So it might have been different?

A. Anything's possible."

Despite the fact that Franks told Sobel, "I'll do whatever I can to make the transition extremely smooth," this allegedly did not occur. On February 20, 1987, Sobel received a telephone call from one of his attorneys informing him that Franks was going to lock him out of his office at the end of that day. Sobel testified that he was devastated. After a quarter of a century, he was being evicted from the building which housed the only job he knew. Moreover, he was 25% owner of the building. Franks owned the remaining interest.

In addition to locking Sobel out, Franks refused to turn over the more than 800 M Account files which allegedly prevented Sobel from servicing his clients. Sobel was also denied access to, use of and compensation for the computer which he had jointly purchased with Franks. Sobel testified that the computer contained information regarding "policies, policy numbers, insurance companies, limits, premiums, all—a wealth of data on the M-account clients."

Many of the policies sold to the M Account clients typically generate renewal or service commissions as long as the policies remain in effect. Nevertheless, Sobel has not received any of the M Account commissions paid to the Agency since being locked out.

Despite this, Sobel was able to salvage some of his M Account business subsequent to being locked out. However, the amount of gross commissions Sobel generated from those M Account clients plummeted from $414,000 in 1986, his last full year with Franks, to approximately $140,000 in 1987, his first year at the new agency with which he had become associated.

In light of his discussion with Franks during which it was decided that he should "find another agency," Sobel and three of his employ-

ees began interviewing with Dick Moll, president of Julius Moll & Son, Inc. Although Moll wanted Sobel to begin their association as soon as possible and preparations were made in anticipation of a new business relationship, Sobel informed Moll that he would not be able to join him until final arrangements for his departure had been made with Franks.

At trial, Sobel elicited the testimony of his expert, Cunningham, who in discussing the general nature of the insurance industry stated that there exists a four-tier structure. The first tier of the structure is the customer or the insured; the second tier is the broker (*e.g.*, Sobel); the third tier is the agency (*e.g.*, Franks); and the fourth tier is the insurance company.

It was Cunningham's opinion that Sobel "was an independent broker housed in the Franks' agency." He stated that in this type of arrangement, it is customary for the broker to trade under the agency name and to use agency stationery and business cards. Sobel likewise testified that he considered himself to be an independent house broker. Cunningham further opined that Sobel owned the M Accounts as well as the right to continue the business relationship with the M Account clients. Additionally, he believed that Sobel owned the right to the continued use of the customer lists as well as all the information contained in the M Account files where use by another competing broker or agency would be improper according to industry custom and practice.

When asked to testify as to the damages suffered by Sobel as the result of the lockout, Cunningham stated that his calculations were based on the difference between the amount of M Account commissions received by Sobel before and after the lockout, divided by two, in accordance with the Sobel-Franks commission agreement. Cunningham then projected this amount 20 years into the future, based on Sobel's career expectancy to age 65. Applying various attrition rates to account for the natural loss of business over time, Cunningham found Sobel's damages to "fall within the range of $1,230,481 and $898,108 with a reasonable opinion to be the mid-point or $1,046,148."

At the close of Sobel's case, Franks moved for a directed verdict, arguing that the evidence showed that, as a matter of law, Sobel had a fiduciary relationship with Franks and that he breached his fiduciary duty to Franks thereby precluding any recovery. Franks' position that a fiduciary relationship existed between the parties was largely based on a portion of Sobel's original complaint, later amended, which read as follows:

"In September, 1962, Sobel, then a young man recently

graduated from college and without experience in the insurance industry, entered a joint venture with Franks to conduct business as a broker of personal and commercial insurance ('the Venture')." Building on this premise, Franks argued that Sobel breached his duty by soliciting the M Account clients for the Moll Agency while he was still associated with Franks. Franks pointed out that Sobel admitted this solicitation in his trial testimony. Evidence was also proffered that Sobel obtained seven agent-of-record letters from the more than 800 M Account clients. Sobel testified that he contacted approximately 20 out of his more than 800 clients to advise them that he was negotiating with Franks and was possibly going to relocate his practice. It was also established at trial that Sobel lied about these solicitations at his deposition hearing. In fact, Sobel's counsel admitted that Sobel solicited "M Account clients about going over to the Moll Agency prior to February 20th."

Franks also argued that Sobel admitted appropriating Franks' agency's "personalty." In support of this position, Franks offered the following testimony by Sobel:

"Q. Okay—Now let's go prior to time of the alleged lock-out. Prior to the lock-out, did there come a time when you removed files from the Franks agency?

A. There was a—I was working on some files, and I took them home, because I was working on the files—

Q. How many files did you take home to work on?

A. I don't recall, but the total files that I had altogether were approximately ten."

In addition, it was pointed out that Sobel acknowledged leaving the Agency with some bags of reference material and files on the day of the lockout. Because of these acts, Franks locked Sobel out of the offices they shared on Friday, February 20, 1987. On Monday, February 23, 1987, Sobel was doing business at the Moll Agency. He had a desk, business cards, employees, a telephone and a list of M Account clients whom he continued to solicit.

Asserting his affirmative defense of breach of fiduciary duty, Franks argued that as a result of the foregoing breaches of duty, Sobel was precluded from any recovery on his claims.

On June 16, 1992, the trial court granted Franks' motion for directed verdict with respect to all counts on the ground that Sobel breached his fiduciary duty. The court's ruling worked a forfeiture of all commissions due Sobel, those from before the lockout as well as those into the future. On its own motion, the trial court then dismissed Franks' counterclaim.

On appeal, Sobel contends that he did not have a fiduciary duty

to Franks with respect to the M Accounts and that, in any event, his relationship with Franks was a question of fact for the jury to decide; whether he breached any fiduciary duty was a question of fact to be determined by the jury; even if he was properly found to have breached a fiduciary duty, the trial court erred in precluding any recovery; and the trial court committed error by directing a verdict with respect to his count for breach of contract, with respect to his count for unjust enrichment, with respect to his count for conversion, with respect to his count for interference with anticipated economic relations, and with respect to his count for unfair competition. Sobel also contends that he did not have to pierce the corporate veil in order to establish Leonard Franks' personal liability.

Sobel asserts that the thrust of his appeal turns on the following three issues: (1) whether there existed, as a matter of law, a fiduciary relationship between Sobel and Franks with respect to the M Accounts; (2) whether, if such a duty existed, Sobel, as a matter of law, breached said duty; and (3) whether, if Sobel did breach a fiduciary duty, the court properly forfeited all commissions due Sobel both before and after the alleged breach. Sobel asserts that the trial court committed error in at least one, if not all three, of the above determinations.

With this in mind, we focus our attention on the facts surrounding Sobel's solicitation of M Account clients and removal of approximately 10 of the M Account files. We do so in an effort to determine whether the trial court correctly directed a verdict for Franks on the basis argued by him that Sobel was his agent and, as such, owed a fiduciary duty to him which he allegedly breached.

In order to facilitate an understanding of the relationship between Sobel and Franks, which is the crux of the matter here, it is helpful to first examine the surrounding relationships which reflect the general structure of the insurance industry, especially as to how it existed in the scenario within which Sobel and Franks worked.

The record reveals that Franks' agency served as an authorized agent for several insurance companies including The Hanover, The Travelers, CNA and Bankers Life of Iowa. Because Franks represented more than one underwriter, he was also considered to be engaged in the insurance brokerage business. He was authorized to bind insurance coverage and was entitled to receive agency commissions for providing that coverage. Thus, the insurers were Franks' principal, and he was their agent. When involved in the process of selling insurance policies to potential insureds, his capacity was that of agent of the insured with the insured operating as his principal.

Franks became associated with Sobel shortly after the latter's

graduation from college in 1962. The parties entered into an oral agreement by which Franks would provide the necessities of the business *(e.g.,* desk, phone and supplies) to Sobel in exchange for 50% of the gross commissions from every insurance policy that Sobel solicited and sold. Because Sobel also sold the policies of various insurance companies, he too was considered an insurance broker, generally acting as the agent of the insureds with whom he dealt. It is important to note, however, that Sobel was not an agent of the insurers where the record reveals that only Franks dealt with the insurers, and the insurance policies, letterhead and business cards were all in the name of Franks' agency.

Because Sobel prepared his tax return as a sole proprietor, paid 100% of his social security taxes, received no salary from Franks, who did not withhold taxes from him, supply him with a W-2 or 1099 form or enter into an agreement with him to share profits and losses, he, with regard to his physical activities, was an independent contractor. Cunningham testified to this effect as did Sobel himself, although Sobel admitted he did not become familiar with the term "house broker" until his expert used it. We find, however, based on the record before us, that Sobel was also Franks' agent.

In *Hoffman & Morton Co. v. American Insurance Co.* (1962), 35 Ill. App. 2d 97, 181 N.E.2d 821, this court held that the characteristic which distinguishes an agent is that he represents another contractually. "When properly authorized, he makes contracts or other negotiations of a business nature on behalf of his principal, by which his principal is bound." *Hoffman & Morton Co. v. American Insurance Co.*, 35 Ill. App. 2d at 102, 181 N.E.2d at 823.

An individual may be both an independent contractor and an agent for another. (*Hoffman & Morton Co. v. American Insurance Co.*, 35 Ill. App. 2d at 102, 181 N.E.2d at 823.) "Thus, an attorney at law, a broker, an auctioneer, and other similar persons employed either for a single transaction or for a series of transactions, are agents, although as to their physical activities they are independent contractors." (*Hoffman & Morton Co. v. American Insurance Co.*, 35 Ill. App. 2d at 102-03, 181 N.E.2d at 823.) Each of them has the power to act for and to bind their principal in business negotiations within the scope of their agency. *Hoffman & Morton Co. v. American Insurance Co.*, 35 Ill. App. 2d at 103, 181 N.E.2d at 823.

■ Applying *Hoffman* to the facts of the present case, we find that Sobel represented Franks contractually as he was authorized by Franks to write insurance policies in the Agency's name and to direct the insureds to make their premium payments to the Agency. Franks was legally bound by the contracts written by Sobel. Therefore, al-

though Sobel's status was that of independent contractor with regard to his physical activities, he was Franks' agent when he solicited and sold an insurance policy to an insured because he was undertaking to manage and render an account of affairs to be transacted for another, known as the principal, by the authority given to him by the latter. *(Hoffman & Morton Co. v. American Insurance Co.*, 35 Ill. App. 2d 97, 181 N.E.2d 821.) Accordingly, we find that the trial court did not err when it found the existence of a fiduciary relationship between Franks and Sobel.

Sobel maintains that even if it were to be assumed that a fiduciary relationship existed between him and Franks, the question as to whether he breached a fiduciary duty was a question of fact to be determined by the jury. As such, he contends that the trial court erred when it removed the question from the jury's province.

■ The failure of a party to reply to new matters raised by way of affirmative defense or countercomplaint constitutes an admission to those allegations. *(Becovic v. Harris Trust & Savings Bank* (1984), 128 Ill. App. 3d 107, 469 N.E.2d 1379, *superseded on other grounds Schwaner v. Belvidere Medical Building Partnership* (1987), 155 Ill. App. 3d 976, 508 N.E.2d 522.) Franks' affirmative defense that Sobel breached his fiduciary duty by soliciting clients to leave the Agency prior to the lockout on February 20, 1987, was never responded to by Sobel. According to *Becovic*, this constitutes an admission of the allegation.

Moreover, the evidence conclusively established that Sobel solicited M Account clients and copied and removed files from the Agency's office prior to being locked out. Sobel also lied under oath at his deposition with regard to his solicitation of clients. Indeed, at trial Sobel's counsel stipulated that Sobel had solicited clients prior to the lockout. Even if Sobel had some interest in the files, he still had a fiduciary duty to the Agency, an obligation which he could not ignore. We find that the trial court correctly held that Sobel had breached his fiduciary duty to Franks.

The cases cited by Sobel to support his position are distinguishable. In *Laurence v. Flashner Medical Partnership* (1990), 206 Ill. App. 3d 777, 565 N.E.2d 146, and *Corroon & Black of Illinois, Inc. v. Magner* (1986), 145 Ill. App. 3d 151, 494 N.E.2d 785, a finding was made at the summary judgment stage. In neither case did the court hear the plaintiff's evidence as the trial court did in the present case. Furthermore, there were no admissions as to the solicitation of customers prior to the termination of the relationship at issue. Moreover, neither court held that the issue as to whether a breach of fiduciary duty has occurred is always a question for the jury. In *R.K. Ray*

*Sales, Inc. v. Genova, Inc.* (1985), 133 Ill. App. 3d 98, 478 N.E.2d 616, the plaintiff did not admit soliciting clients or removing files as Sobel did here. The only evidence of wrongdoing was the sales agent's receipt of commission checks from a competitor. Finally, *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.* (1980), 90 Ill. App. 3d 817, 413 N.E.2d 1299, another case cited by Sobel, relates primarily to the issue of forfeiture.

Sobel next contends that even if he was properly found to have breached a fiduciary duty, the trial court erred in precluding any recovery whatsoever. Specifically, he argues that the forfeiture of damages, if any, should be limited to those which accrued during the period within which the court found the alleged breach to have occurred. He claims that the trial court erred in denying him his commissions for a period which could, as Cunningham testified, go "virtually forever into the future." Sobel contends that this is particularly so where Franks benefited substantially from Sobel's diligent performance of his duties during the period of the alleged breach when Sobel was attempting to secure a new working relationship. To support his position, Sobel asserts that evidence was presented which indicated that his commissions increased annually throughout his association with Franks. He, therefore, maintains that his damages should either have not been limited at all, or limited strictly to the period of his alleged breach. He contends that the trial court's ruling resulting in the forfeiture of all commissions earned by him forever not only usurped the jury's province, but was erroneous as a matter of law.

Sobel admits that the issue here is future commissions. However, not only did he testify that the parties were free to compete for these clients, he also indicated that there was no guarantee that these clients would stay with either of them or that they would pay their premiums year after year. If Sobel claims that he is entitled to commissions on "vested" insurance, such as life insurance, he put on no proof at trial and has thereby waived any such claim.

■ In *Hill v. Names & Addresses, Inc.* (1991), 212 Ill. App. 3d 1065, 571 N.E.2d 1085, a case relied on by Franks in support of his motion for directed verdict and by the trial court in granting the motion, this court held that an agent's breach of fiduciary duty forfeits his right to compensation. Therefore, with regard to the damages at issue here, that is those other than the ones addressed in Sobel's breach of contract and unjust enrichment claims, Sobel forfeited any commissions earned during the period of his breach. (*Hill v. Names & Addresses, Inc.*, 212 Ill. App. 3d 1065, 571 N.E.2d 1085; *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.*, 90 Ill. App.

3d 817, 413 N.E.2d 1299.) Furthermore, since the parties were free to compete after the termination of their relationship and did so, where the record reveals that Sobel took some accounts and the Agency kept some accounts, Sobel would not be entitled to any future commissions that he may have earned.

We find *Monotronics Corp. v. Baylor* (1982), 107 Ill. App. 3d 14, 436 N.E.2d 1062, a case upon which Sobel relies, to be distinguishable. Although the defendant in *Monotronics* engaged in a competing business while working diligently for the plaintiff corporation, there is no indication that he solicited clients and removed files as Sobel did in the present case, actions which were not acquiesced to by Franks when he and Sobel agreed that Sobel should find a new agency.

Sobel next argues that the trial court committed error in directing a verdict with respect to his count for breach of contract. He maintains that, at trial, his expert testified at length as to his estimate and calculation of damages, and that the damage proof presented falls within the acceptable standard for presentation to the jury.

■ A review of the record reveals that in his breach of contract count, Sobel is claiming only those commissions allegedly earned in February 1987. This fact was specifically agreed to at trial by Sobel's counsel. The testimony of Sobel's expert, Cunningham, therefore, has no relevance to the breach of contract count where the transcript reveals that the parties agreed that Cunningham was not allowed to testify as to what the agreement/contract was between Sobel and Franks, if any. Rather, it was understood that the expert could only testify as to custom and practice in the industry as it relates to tortious conduct. Moreover, because Sobel solicited clients and removed files from the Agency's offices in February 1987, he has forfeited those commissions where a breach of fiduciary duty operates as a bar to a breach of contract claim. (*Hill v. Names & Addresses, Inc.*, 212 Ill. App. 3d 1065, 571 N.E.2d 1085.) Therefore, because Sobel forfeited his February 1987 commissions by virtue of his breach and since there is no evidence regarding damages in that month, we find that the trial court properly directed a verdict as to Sobel's breach of contract claim.

Sobel next contends that the trial court erred in directing a verdict as to his count for unjust enrichment. With regard to Franks' assertion of the affirmative defense of breach of fiduciary duty, Sobel contends that the notion of fiduciary duty is irrelevant to an unjust enrichment claim.

■ The theory of unjust enrichment is based upon a contract

implied in law. (*People ex rel. Hartigan v. E&E Hauling, Inc.* (1992), 153 Ill. 2d 473, 607 N.E.2d 165; *Premier Electrical Construction Co. v. La Salle National Bank* (1984), 132 Ill. App. 3d 485, 477 N.E.2d 1249.) Because a breach of fiduciary duty is a defense to a contract claim (*Hill v. Names & Addresses, Inc.*, 212 Ill. App. 3d 1065, 571 N.E.2d 1085), we find that it also bars a quasi-contractual claim. The record reveals that Sobel agreed that his unjust enrichment claim was limited to those commissions earned in February 1987. We therefore find that this count was properly directed out for the same reasons that the breach of contract count was dismissed. In addition, we note that quasi-contractual relief is not available where there exists a definite contract between the parties (*People ex rel. Hartigan v. E&E Hauling, Inc.*, 153 Ill. 2d 473, 607 N.E.2d 165; *Spinak, Levinson & Associates v. Industrial Comm'n* (1990), 209 Ill. App. 3d 120, 568 N.E.2d 41), as it does here as evidenced by Sobel's breach of contract claim.

Sobel's reliance on *M.J. McCarthy Motor Sales Co. v. Van C. Argiris & Co.* (1979), 78 Ill. App. 3d 725, 396 N.E.2d 1253, for the proposition that a breach of fiduciary duty is irrelevant to an unjust enrichment claim, is misplaced. Rather, the case states, *inter alia*, that there is no duty or privity requirement when bringing a claim for unjust enrichment.

■ Sobel next contends that the trial court erred in directing a verdict with respect to his count for conversion. In order to establish a cause of action for conversion, Sobel had the burden to prove, *inter alia*, an unauthorized assumption of the right to possession or ownership by Franks. (*Andrews v. Mid-America Bank & Trust Co.* (1987), 152 Ill. App. 3d 139, 503 N.E.2d 1120.) Here, the evidence showed that the files belonged to the Agency. Not only did Franks have the agency contracts with the insurance companies that gave him the right to place insurance with a certain company, the agency had an obligation to keep the files for future claims.

Because the record reveals that the files belonged to Franks, there is no evidence of their unauthorized taking. Moreover, Franks offered copies of the files to Sobel, but he did not want to pay for them. Based on the above, we find that the trial court did not err when it directed a verdict against Sobel with respect to his conversion count.

Sobel also argues that the trial court erred in directing a verdict with respect to his count for interference with anticipated economic relations.

To establish a cause of action for the tort of intentional interference with a business expectancy, Illinois law requires that

the following four elements be present: (1) the existence of a valid business expectancy by plaintiff; (2) the defendant's knowledge of the expectancy; (3) the defendant's intentional and unjustified interference which prevents the realization of the business expectancy; and (4) damages. *Mannion v. Stallings & Co.* (1990), 204 Ill. App. 3d 179, 561 N.E.2d 1134.

■ In the present case, Sobel had the burden of proving that Franks induced M Account clients not to enter into or continue a business relationship with him. (*Heying v. Simonaitis* (1984), 126 Ill. App. 3d 157, 466 N.E.2d 1137.) Sobel, however, failed to meet his burden as he did not identify one client with whom Franks interfered. In fact, he admitted at trial that during his deposition, he stated that under his agreement with Franks, there was nothing which prevented Franks from contacting any of the M Account clients. Sobel was unable to demonstrate a loss of business on account of Franks' conduct, and the trial court granted Franks' motion *in limine* on this issue. The trial court did not err when it directed a verdict against Sobel on his claim for tortious interference where Sobel's breach of fiduciary duty also barred recovery on this count.

Sobel next argues that the trial court erred when it directed a verdict against him with respect to his count for unfair competition.

■ Although Sobel contends that Franks' retention of the M Account files was improper, the record shows, as previously stated, that the files belonged to Franks. Therefore, Sobel has no factual underpinning for his claim. Additionally, Sobel's breach of fiduciary duty serves to bar the count for unfair competition.

We find noteworthy, for purposes of this issue, the fact that Sobel never identified any one individual specifically stating that he or she refused to take his or her business to Sobel after the termination of the relationship. Furthermore, not one client testified that it was Sobel's lack of access to files that caused him or her to switch to another insurance broker. Interestingly enough, Sobel's claimed largest client and college friend chose to stay with Franks. The trial court did not err when it directed a verdict against Sobel as to his unfair competition claim.

Lastly, Sobel contends that he did not have to pierce the corporate veil to establish personal liability on behalf of Franks.

■ If Sobel's claim is true that Franks' liability is derivative of the corporation's liability, Sobel would have had to establish the Agency's liability before Franks could have become personally liable in this case. Since we find that the trial court properly directed a verdict as to each and every count relating to the Agency, Leonard Franks is not personally liable.

■ On cross-appeal, Franks contends that the trial court erred in allowing Sobel's expert, Cunningham, to offer certain testimony and in limiting its cross-examination of him. Franks' appeal is conditioned upon our reversing and remanding the matter for trial, and, if we have jurisdiction of the issue, we need not discuss it.

In his second contention on cross-appeal, Franks asserts that the trial court erred in dismissing his counterclaim on its own motion. Counsel for Franks informed the court that the counterclaim was for a small amount of damages. And, when the trial judge stated that he was going to dismiss the counterclaim, counsel expressed no disapproval and indeed stated that he would have recommended such an action to his clients. Dismissal of the counterclaim was proper.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

EGAN, P.J., and GIANNIS, J., concur.