2023 IL App (1st) 220633

No. 1-22-0633

Opinion filed September 27, 2023

Third Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| FRANCINE CORNEJO, Individually and as Mother and Next Friend of Gustavo Cornejo Jr., | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17 L 003274 |
| DAKOTA LINES, INC.; GORDON LEWIS; and ALLIANCE SHIPPERS, INC., | ) ) ) ) | |
| Defendants | ) ) | Honorable Bridget J. Hughes, |
| (Alliance Shippers, Inc., Defendant-Appellant). | ) | Judge, presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Justices Hoffman and Martin concurred in the judgment and opinion.

**OPINION**

¶ 1    Gustavo Cornejo Jr., was severely injured when he was standing near his family's vehicle on the shoulder of a highway and was struck by an 18-wheel tractor-trailer. Plaintiff Francine Cornejo brought a negligence suit on behalf of her son against defendants Gordon Lewis, the truck driver; his employer, the carrier Dakota Lines, Inc. (Dakota); and Alliance Shippers, Inc.

(Alliance), the shipping broker that contracted with Dakota to transport automotive parts on behalf of Alliance's client. Dakota admitted that Lewis was its agent at the time of the accident.

¶ 2 The jury answered a special interrogatory by finding that Dakota was Alliance's agent at the time of the accident. Accordingly, the jury found that Lewis, Dakota, and Alliance were liable to plaintiff and awarded plaintiff $18,150,750.

¶ 3 Alliance appealed the judgment, arguing that it is entitled to judgment notwithstanding the verdict (judgment *n.o.v.*) because, as a matter of law, Dakota was an independent contractor and neither Lewis nor Dakota were agents of Alliance. Alliance also argues that it is entitled to a new trial because the jury's verdict was against the manifest weight of the evidence and the trial court committed multiple instructional and evidentiary errors. Further, Alliance argues that it is entitled to a new trial on damages or a remittitur and that the trial court erred by awarding prejudgment interest. Neither Dakota nor Lewis appealed the judgment entered against them.

¶ 4 For the reasons that follow, we reverse the judgment of the trial court entered against Alliance.

¶ 5                                    I. BACKGROUND

¶ 6 The accident at issue here occurred in 2016, and plaintiff filed her first complaint against Lewis and Dakota in 2017. Prior to trial, plaintiff filed several amended complaints that added and removed various parties. We concern ourselves only with plaintiff's seventh amended complaint, which was the operative pleading at the time of trial, and eighth amended complaint, which was filed postjudgment.

¶ 7 In her seventh amended complaint, plaintiff alleged (1) negligence on the part of Alliance and that Lewis was an actual, implied, and/or apparent agent, servant, and/or employee of Alliance

at the time of the accident, (2) negligence on the part of Dakota, and that Lewis was an actual, implied, and/or apparent agent, servant, and/or contractor of Dakota at the time of the accident, and (3) Lewis's own negligence in regard to the accident.

¶ 8     The issue in this case is whether a principal-agency relationship was established between the shipping broker Alliance and the carrier trucking company Dakota and its agent and driver Lewis. The following is a summary of the trial testimony relevant to the issue of whether Lewis and Dakota were Alliance's agents.

¶ 9     Since the 1990s, Dakota had contracted with Alliance to transport automotive parts for Alliance's client, Fiat Alfa Romeo Chrysler. At the time of the accident, Lewis was driving his truck, or tractor, under Dakota's operating authority and was towing an empty shipping container, or trailer, owned by J.B. Hunt Transport, Inc. (J.B. Hunt). Alliance, as part of an interchange agreement with J.B. Hunt, agreed to use only J.B. Hunt trailers for transporting goods at an agreed upon rate. Alliance did not own any tractors or trailers. Dakota had 70 to 100 trucks under its operating authority.

¶ 10    The arrangement between Dakota and Alliance provided that Alliance would notify Dakota, via a system known as an electronic data interchange (EDI), that a shipment of parts was ready for transport. A driver employed by Dakota first would travel to a railyard in Sauk Village, Illinois, and retrieve an empty cargo container owned by J.B. Hunt. If a J.B. Hunt trailer was unavailable in Sauk Village, Dakota was required to source one from another location at Dakota's expense. The driver would move the empty container to a location in Portage, Indiana, known as Portage Exel, where the empty container would be swapped for a container full of automotive parts. This process was part of Dakota's obligation to Alliance to meet "pool requirements" by

ensuring that Alliance had a steady supply of empty containers for loading cargo. The driver then drove the loaded container to a location in Detroit, Michigan, known as Detroit Link.

¶ 11 Dakota hired Lewis, trained him, gave him Dakota's driver's handbook, paid him, and withheld taxes from his paychecks. Lewis did not communicate with anyone directly employed by Alliance. Alliance did not instruct Lewis on what roads to take between Sauk Village and Portage Exel or between Portage Exel and Detroit Link. Alliance did not provide Lewis with any tools, equipment, or materials. Alliance did not own the tractor or trailer. Alliance did not have the power to hire or fire Dakota drivers but could request that a driver be removed from a route. Alliance was Dakota's second or third largest customer but Dakota was not Alliance's primary carrier.

¶ 12 The contract between Alliance and Dakota specified that Dakota was an independent contractor, Dakota and Alliance would not be considered the agent of the other, and Dakota was solely responsible for its employees and agents. A contractual provision required Dakota to list Alliance as an additional insured on Dakota's auto and comprehensive general liability insurance and indemnify, defend Alliance, and hold Alliance harmless from all claims for death or injury arising out of the transportation of property. Dakota was forbidden from subcontracting or delegating any work given to it by Alliance. In fact, doing so would have voided the contract. Dakota was free to accept trucking work from other companies, and Alliance was free to use the transportation services of other carriers besides Dakota. However, if Dakota accepted freight from Alliance's clients, then Dakota had to share 10% of any such revenue with Alliance.

¶ 13 Alliance told Dakota when and where to pick up goods, how long Dakota had to deliver them, and whether the delivery had to be on a flatbed or by a container. Alliance did not require Dakota to use particular tools, but did specify the type of container and chassis (the part of the

trailer upon which the container is mounted) that Dakota had to use. Alliance also required Dakota to use the EDI system to communicate the particulars of shipments. If a shipment that Dakota was transporting was delayed because of an accident or other problem, Dakota had to notify Alliance immediately and typically would need to send another driver to "rescue the load." Dakota had to pay Alliance the full value of the goods if a shipment was lost, damaged, or not delivered. If issues arose regarding payment, Dakota was forbidden from contacting Alliance's client and could only receive payment from Alliance.

¶ 14    Dakota had to maintain a "satisfactory" rating with the Federal Motor Carrier Safety Administration, was required to notify Alliance if that rating fell to "conditional" or "unsatisfactory," and had to provide an explanation of how Dakota planned to change that rating. Pursuant to Alliance's website, it made a "perfect shipment" commitment to its customers (*i.e.*, on-time pickups and deliveries with the load's integrity intact and an accurate freight bill). Accordingly, Alliance had requirements for Dakota regarding seal integrity, freight bills, and cargo security for drivers pulling loaded containers. As part of its business dealings, Alliance maintained a "perfect shipment exception report," which was given to Dakota every month. That report scored Dakota on how frequently it picked up and delivered a shipment on time. Dakota had to maintain an on-time percentage of 98.7% to avoid jeopardizing its future business with Alliance.

¶ 15    Plaintiff's transportation expert, Professor Carl Berkowitz, testified that Alliance and Dakota's subcontracting restriction was different from the rest of the shipping industry at large. He also testified that carriers like Dakota were typically required to have insurance, but they usually were not required to indemnify other companies. Berkowitz based his opinion regarding the relationship between Dakota and Alliance on the contract requirements regarding

insurance/indemnity provisions, the limitations on Dakota's solicitation of Alliance's customers and employees, the nondelegation of Dakota's duties and obligations under the contract, and Alliance's instructions regarding pickups and drops, seal integrity, rate changes, and accessorial charges. He opined that Alliance had "serious control, almost complete control [over Dakota], because [Alliance] laid out exactly what they want[ed] Dakota to do, and if Dakota didn't do it, [Alliance] had the option of not using Dakota in the future." Lewis's actions had no bearing on the issues plaintiff asked Berkowitz to review concerning control, and Berkowitz did not analyze the relationship between Lewis and Alliance in forming his opinion.

¶ 16    Dakota's vice-president, Gary Blom, testified that Dakota was an independent contractor; Dakota was not Alliance's agent for any purpose; Dakota could do business with other brokers; Dakota's drivers handled all the details of how a load moved between the Portage and Detroit sites; and Lewis was not under Alliance's control or direction when he was on his 10-hour Department of Transportation mandated break, while moving the empty container to his drop yard overnight at the time of the accident. Blom also testified that Alliance could give Dakota work, but was not required to do so, and Dakota did not have to accept the work Alliance offered to Dakota.

¶ 17    Alliance moved for a directed verdict at the close of plaintiff's case and again at the close of the evidence. In denying Alliance a directed verdict before closing arguments, the trial court referred to evidence of Alliance's marketing material mentioning timely deliveries and the ability to request another Dakota driver, even though Alliance could not fire any Dakota driver, as examples of Alliance's control over Lewis.

¶ 18    Over Alliance's objection, the trial court issued a special interrogatory that read, "Do you find that defendant Dakota Lines, Inc. was the agent of Alliance Shippers, Inc. at the time of the

occurrence?" No analogous interrogatory, asking the jury to decide if Lewis was an agent of Alliance, was given.

¶ 19    The jury found that Lewis, as Dakota's admitted agent, was negligent and answered the special interrogatory that Dakota was Alliance's agent. The trial court entered judgment on the jury's verdict in favor of plaintiff and against Lewis, Dakota, and Alliance in the amount of $18,150,750.

¶ 20    Thereafter, the trial court entered an order that denied Alliance's posttrial motion and granted plaintiff's motion seeking leave to file an eighth amended complaint. That complaint, like the seventh amended complaint, alleged that Dakota was negligent, that Lewis was Dakota's agent at the time of the accident, and that Lewis himself was negligent. Whereas the seventh amended complaint alleged Alliance's negligence by way of Lewis as Alliance's agent, the eighth amended complaint alleged that Dakota was Alliance's agent and, thus, Alliance controlled Dakota and Dakota's agents like Lewis. The trial court's order also awarded $466,161.20 in prejudgment interest.

¶ 21                                II. ANALYSIS

¶ 22    Alliance raises eight separate arguments before this court, but we need not address any beyond the first. Alliance argues that the trial court erred by refusing to grant Alliance a judgment *n.o.v.* because Alliance was not vicariously liable for Lewis's negligence, since neither Lewis nor Dakota were Alliance's agents. We agree.

¶ 23    A judgment *n.o.v.* is properly entered in those limited cases where all the evidence, when viewed in the light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. *McClure v. Owens Corning Fiberglas*

*Corp.*, 188 Ill. 2d 102, 132 (1999); *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 504-05, 510 (1967); see also *People v. Rosochacki*, 41 Ill. 2d 483, 490 (1969) (although some evidence, when viewed alone, may seem substantial, "courts are to decide when weak evidence has so faded in the strong light of all of the proof that only one verdict is possible of rendition"). Judgment *n.o.v.* is not appropriate if reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented. *McClure*, 188 Ill. 2d at 132. A trial court cannot reweigh the evidence and set aside a verdict merely because the jury could have drawn different inferences or conclusions, or because the court feels that other results are more reasonable. *Id.* Likewise, the appellate court should not usurp the function of the jury and substitute its judgment on questions of fact fairly submitted, tried, and determined from the evidence which did not greatly preponderate either way. *Id.*

¶ 24    "In ruling on a motion for a judgment *n.o.v.*, a court does not weigh the evidence, nor is it concerned with the credibility of the witnesses; rather it may only consider the evidence, and any inferences therefrom, in the light most favorable to the party resisting the motion." *Maple v. Gustafson*, 151 Ill. 2d 445, 453 (1992). A judgment *n.o.v.* may not be granted merely because a verdict is against the manifest weight of the evidence. *Id.* In fact, a court has no right to enter judgment *n.o.v.* if there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome. *Id.* at 454. We review *de novo* a trial court's decision on a motion for judgment *n.o.v. McClure*, 188 Ill. 2d at 132.

¶ 25    Generally, a person injured by someone's tortious action must seek a remedy from the person who caused the injury. *Grinyov v. 303 Taxi, L.L.C.*, 2017 IL App (1st) 160193, ¶ 26.

However, the principal-agent relationship provides an exception to the general rule. *Id.* " 'Under the doctrine of *respondeat superior*, a principal may be held liable for the tortious actions of an agent which cause a plaintiff's injury, even if the principal does not himself [or herself] engage in any conduct in relation to the plaintiff.' " *Id.* (quoting *Woods v. Cole*, 181 Ill. 2d 512, 517 (1998)).

¶ 26     A principal is vicariously liable for the conduct of its agent but not for the conduct of an independent contractor. *Sperl v. C.H. Robinson Worldwide, Inc.*, 408 Ill. App. 3d 1051, 1057 (2011). The difference is defined by the level of control over the manner of work performance. *Id.* An agency is a consensual relationship in which a principal has the right to control an agent's conduct and an agent has the power to affect a principal's legal relations. *Id.* "An independent contractor relationship is one in which an independent contractor undertakes to produce a given result but, in the actual execution of the work, is not under the order or control of the person for whom he does the work." *Id.* Any labels given by the parties in a written agreement are not dispositive of employment status. *Id.* Although a carrier-broker agreement, like the one between Dakota and Alliance, is a factor to consider, it does not, as a matter of law, determine an individual's or entity's agency status. See *id.*

¶ 27     Instead, the facts and circumstances of each case determine whether a person is an agent or an independent contractor. *Grinyov*, 2017 IL App (1st) 160193, ¶ 27. The cardinal consideration is whether that person retains the right to control the manner of doing the work. *Id.* Other factors courts consider include (1) the question of hiring, (2) the right to discharge, (3) the manner of direction of the servant, (4) the right to terminate the relationship, and (5) the character of the supervision of the work done. *Id.* The presence of one or more of these facts and indicia merely serves as a guide to resolving the primary question of whether the alleged agent is truly an

independent contractor or is subject to control. *Id.* "The issue of a defendant's retained control may be decided as a matter of law where the evidence is insufficient to create a factual question." *Carney v. Union Pacific R.R. Co.*, 2016 IL 118984, ¶ 41 (deciding the issue in the context of a summary judgment motion). In determining whether a defendant acted as an agent versus an independent contractor, the analysis hinges on whether the principal controlled either the "mere result" or the manner in which that result was achieved. *Perkinson v. Manion*, 163 Ill. App. 3d 262, 266, 268 (1987).

¶ 28    The trial court erred when it denied Alliance's motion for judgment n.o.v. because all the evidence—when viewed in the light most favorable to plaintiff—so overwhelmingly favors Alliance by showing, as a matter of law, that Lewis and Dakota were not agents of Alliance that no contrary verdict based on that evidence can stand. Alliance did not pay Dakota's drivers and withhold taxes from their pay; hire, train or fire the drivers; dispatch or speak to the drivers; control the drivers' routes or provide them with tools, equipment, or materials; or own the tractors or trailers the drivers used. It is undisputed that Dakota and Alliance adhered to the terms of their agreement, which provided that Dakota had full control over its personnel and would perform services as an independent contractor. Moreover, Dakota and Alliance did not have an exclusive relationship; Dakota was free to haul freight for other brokers and was not Alliance's primary carrier. Dakota hired, trained, and fired its drivers; paid them; and withheld taxes from their paychecks.

¶ 29    Plaintiff's facts in support of an agency relationship are that Dakota was required to maintain a minimum number of empty trailers at the Indiana site; Dakota was required to add Alliance as an additional insured on Dakota's insurance and indemnify Alliance; Alliance had

requirements regarding seal integrity, freight bills, and cargo security; Alliance would designate if a delivery had to be on a flatbed or by a container; Alliance required Dakota to EDI, e-mail, and fax Alliance multiple times a day regarding pickup and delivery times; Dakota was required to notify Alliance immediately regarding issues like a crash or problem that prohibited Dakota from moving a load, and then Alliance would decide whether Dakota should send another driver to "rescue the load"; Alliance could charge Dakota for damages if a delivery was late, damaged, or lost; and Alliance kept a scorecard of the timeliness of Dakota's deliveries. A decrease in Dakota's score could jeopardize future freight orders. But none of these facts show the degree of control over the work performed (here, hauling loads) that Illinois courts have required when finding that an agency relationship exists.

¶ 30     For example, in *Sperl*, 408 Ill. App. 3d at 1058, this court found that the jury's finding of an agency relationship was not against the manifest weight of the evidence based on the high degree of control the broker exerted over the driver. Specifically, the broker directly hired, paid, and dispatched the driver and directed delivery to the broker's own warehouse. *Id.* at 1053-55, 1058-59. The broker also specified the trailer length, required the driver to take the trailer temperature regularly, required the driver to stay in constant communication with the broker, and imposed delivery times on the driver that were enforced by fines the broker directly imposed on the driver. *Id.* at 1053-55, 1058. The driver testified that the broker imposed an impossible fine-enforced schedule, and she had to violate federal hours-of-service regulations to deliver the load on time and avoid the fines. *Id.* at 1055, 1058. The court ruled that the broker controlled the manner by which the driver drove the load by dictating a fine-enforced schedule. *Id.* at 1058.

¶ 31    Here, in contrast, the evidence is undisputed that Dakota hired and paid Lewis. Only Dakota, and not Alliance, had the power to fire Lewis, and Alliance had no ability to fine him. Also, Lewis never communicated with Alliance; Dakota dispatched Lewis for his work. If Alliance was unsatisfied with Lewis, the most it could do was request that Dakota assign a different driver. There is no evidence that Alliance controlled the manner by which the load was hauled.

¶ 32    Furthermore, in *Powell v. Dean Foods Co.*, 2013 IL App (1st) 082513-B, ¶¶ 74-75, this court upheld the jury's finding of an agency relationship between the shipper, the carrier, and the carrier's drivers because the evidence showed that the shipper exerted sufficient control over the manner in which the carrier's drivers performed the work to establish agency. The carrier Alco of Wisconsin, Inc. (Alco), employed the driver, and the Alder Group, Inc. (Alder), owned the tractor. *Id.* ¶ 1. The driver testified that Alco was part of Alder. *Id.* ¶ 14. The shipper, Dean Foods Company (Dean Foods), owned the trailer. *Id.* ¶ 1. At the time of the accident, the relationship between Dean Foods, Alder, and Alco had been in place for 60 years, and Alder/Alco transported exclusively for Dean Foods. *Id.* ¶ 69. Dean Foods' logo appeared on the truck tractor and trailer and on the uniforms of the Alder/Alco employees. *Id.* ¶ 64.

¶ 33    This court rejected Dean Foods' argument that it was entitled to judgment *n.o.v.* and held that the evidence was sufficient to establish that Dean Foods had the right to control the actions of Alder/Alco's drivers. *Id.* ¶¶ 64, 69. Specifically, Alder had received the "Partners in Distribution Award" from Dean Foods, and Alder/Alco's assistant safety director and driver trainer used Dean Foods' letterhead, including when he reprimanded drivers. *Id.* ¶ 69. Alder's driving manual stated that the Alder/Alco drivers were part of Dean Foods' fleet and instructed them to wear Dean Foods' clothing and act in a manner that would encourage positive opinions about Dean Foods. *Id.* The

manual specifically stated, " 'When you step out of your truck, you are immediately recognized as DEAN FOODS.' " *Id.*

¶ 34    Here, in contrast, no evidence showed that Dakota was intertwined with Alliance the way that Alder/Alco was deeply intertwined with Dean Foods in *Powell*. There was no evidence that Lewis was trained using materials that said he was part of Alliance's fleet or otherwise associated with Alliance. He did not wear clothing or use equipment bearing Alliance's name or otherwise hold himself out as an employee of Alliance the way drivers in *Powell* did. Indeed, unlike Dean Foods, Alliance did not provide any of the equipment Lewis used. See *id.* Also, the relationship between Alliance and Dakota was not an exclusive relationship like that between Dean Foods and Alder/Alco. See *id.* Further, while not dispositive, the fact that the Dakota-Alliance contract specified that Dakota was an independent contractor with sole responsibility for its employees cannot be ignored. See *Carney*, 2016 IL 118984, ¶ 41 (describing the written agreement as the "best indicator of whether the defendant retained control" over a contractor's work).

¶ 35    Finally, in *McHale v. Kiswani Trucking, Inc.*, 2015 IL App (1st) 132625, this court upheld a jury's finding of an agency relationship among a shipping broker, a carrier, and the carrier's drivers. There, a truck driver was employed by carrier Kiswani Trucking, Inc. (Kiswani), which was in turn contracted by shipping broker Transfreight, LLC (Transfreight), to move auto parts for Toyota. *Id.* ¶¶ 1, 4-5. The broker owned the loaded trailer that the driver was hauling at the time of the collision. This court rejected broker Transfreight's arguments for a judgment *n.o.v.* or ruling that the verdict was against the manifest weight of the evidence, noting that the jury heard "days of conflicting testimony regarding the relationship between the parties and the factors to be considered in determining whether an agency relationship exits." *Id.* ¶¶ 54, 70.

¶ 36    Regarding the considerable evidence showing that broker Transfreight controlled the manner in which carrier Kiswani and the driver performed their work, the contract between Transfreight and Toyota stated that Transfreight would have exclusive control over the manner in which employees and subcontractors performed the transportation services and that those hired by Transfreight would be considered Transfreight's employees or subcontractors. *Id.* ¶ 68. Transfreight and Kiswani's broker-carrier contract, which designated the carrier as the broker's subcontractor, expressly incorporated the Transfreight-Toyota contract that gave broker Transfreight exclusive control over how the subcontractors performed all transportation services and required the carrier's express agreement to support Transfreight's contractual obligations to Toyota. *Id.* ¶¶ 6, 8, 10, 54, 68-71, 82, 85. Transfreight also determined whether a particular shipment would have a solo driver or a team and dictated what route would be used, including the time windows. *Id.* ¶ 69. Drivers had to report their progress and had to follow Toyota's standards for loading, delivery, and freight verification. *Id.* Also, an expert witness testified that the driver was an employee of both Transfreight and Kiswani (*id.*), and the general manager of Kiswani testified that Kiswani was Transfreight's agent (*id.* ¶ 20).

¶ 37    Here, in contrast, the jury did not hear conflicting testimony, and the undisputed facts established that Alliance did not dictate Dakota drivers' routes. Also, the contract between Dakota and Alliance stated that Dakota retained sole control over its employees. Although plaintiff's expert opined that Alliance exercised "serious control" over Dakota, Dakota's vice-president testified that Dakota was still an independent contractor, did not have to accept work Alliance offered it, and was not an agent of Alliance. Moreover, while an expert in *McHale* testified that

the driver was an employee of both the broker and the carrier, plaintiff's expert here admitted that he did not even analyze the relationship between driver Lewis and broker Alliance. See *id.* ¶ 69.

¶ 38    Although plaintiff's expert testified that Alliance had "serious control, almost complete control, because they laid out exactly what they want Dakota to do, and if Dakota didn't do it, they had the option of not using Dakota in the future," that is not incompatible with our conclusion, based on the case law discussed here, that Dakota was not an agent of Alliance. Alliance specifying the result it wanted Dakota to accomplish *vis-à-vis* tasks such as moving empty containers or shipping cargo is different from dictating the manner in which the work of hauling the containers would be performed. At best, Alliance's requirements on Dakota were indicative of Alliance controlling the result or matters ancillary to the work to be performed.

¶ 39    Meanwhile, courts applying Illinois law consistently have declined to find an agency relationship when a company hires an independent driver to deliver a load to designated persons at designated times but does not reserve the right to control the manner of delivery.

¶ 40    In *Shoemaker v. Elmhurst-Chicago Stone Co.*, 273 Ill. App. 3d 916, 917 (1994), the plaintiff sued the shipper, which sold construction materials; the carrier, Lawrence Trucking, Inc.; and the truck driver, who owned the truck involved in the accident but had leased it to carrier Lawrence Trucking. Lawrence Trucking entered into equipment leases with drivers so it could service customers when its own truck drivers were busy. Although Lawrence Trucking leased tractors and trailers, it did not have physical possession of the equipment. *Id.* at 918. Lawrence Trucking obtained hauling jobs from the shipper and kept 5% of the total compensation, while the remainder went to the driver, who did not receive employment benefits from Lawrence Trucking. *Id.* The driver would go to jobs as directed by Lawrence Trucking, but he had no agreement with

the shipper, and the shipper never provided the driver with any rules about how his truck was to be driven. *Id.* The driver controlled the maintenance on his tractor and trailer, and customers like the shipper could not pay the driver directly. *Id.* The shipper could not terminate the driver's arrangement with Lawrence Trucking. *Id.* Employees of the shipper might help drivers load the truck, but after the truck departed, the shipper had no contact with the drivers and did not dictate routes or the manner in which the truck was driven. *Id.* at 919.

¶ 41 The jury was given a special interrogatory asking whether the shipper had the right to control the driver's actions. *Id.* The jury responded affirmatively and found in favor of the plaintiff against the shipper. *Id.* This court, however, reversed the jury's verdict, ruling that no agency relationship existed as a matter of law because the shipper did not have the right to control the manner in which the driver performed his job hauling loads. *Id.* at 921. The shipper did not pay the driver, could not hire or fire him directly, and was not his employer. The shipper did not control the driver's driving or other conduct in hauling the load. The shipper's weighing the truck and assisting or overseeing the loading of the truck were preliminary tasks necessary before the driver could begin to perform his job. *Id.* Also, the shipper's instructing the driver where he should deliver the load did not control the manner in which the job was done but rather specified the particular hauling task. *Id.*

¶ 42 Lewis's and Dakota's relationships with Alliance are like that present in *Shoemaker*, where the shipper had no contact with the carrier's drivers and did not dictate routes or the manner in which the truck was driven. Like the shipper in *Shoemaker*, Alliance specified only the particular hauling task (*i.e.*, the mere result), rather than controlling the manner in which the work was done. See *id.* Even if an entity requires an exclusive relationship with the driver, has the power to fire

the driver, and sets rules governing the manner of loading the trucks, no agency relationship exists if that entity does not have the power to control the details of the manner of the hauling work performed. See *Dowe v. Birmingham Steel Corp.*, 2011 IL App (1st) 091997, ¶ 31 (ruling that no agency relationship existed between the shipper and driver of the tractor-trailer, who was employed, paid, and insured by the carrier trucking company, where the driver chose his own route, controlled his own hours, performed his job according to the rules he received from his carrier employer, and provided and maintained his own equipment).

¶ 43    In *Petersen v. U.S. Reduction Co.*, 267 Ill. App. 3d 775, 777 (1994), the aluminum manufacturer contracted with Cardinal Transport, which leased a fleet of trucks to carrier Coleman Movers, which employed the driver. The driver was shot and killed as he drove away from a picket line that he crossed at the manufacturer's plant. *Id.* The driver's wife sued the manufacturer for failing to warn the driver of threats against replacement drivers hired to work during the strike. *Id.* Whether the manufacturer had a duty to warn the driver turned in part on whether he was the manufacturer's agent. *Id.* at 779. This court held that the driver's relationship to the manufacturer was that of an independent contractor because the only control the manufacturer exerted over him was to specify a delivery schedule and require him to use special vats to transport the manufacturer's molten metal. *Id.* at 783-84.

¶ 44    Here, the fact that Lewis was required to pick up and deliver the J.B. Hunt trailer is no proof of an agency relationship. If the mandated use in *Petersen* of specialized vats, necessary for transporting molten metal, was not enough to establish agency, then the generalized requirement that Dakota's drivers obtain and transport J.B. Hunt containers did not demonstrate agency.

¶ 45    In *Manahan v. Daily News-Tribune*, 50 Ill. App. 3d 9 (1977), the court ruled that the newspaper deliveryman was an independent contractor as a matter of law where the agreement provided that the driver was to deliver papers at designated hours to designated persons but the driver had the right to determine the routes to be taken and was to pay all taxes. The agreement also provided that the newspaper should not exercise control over the driver's operation as an independent contractor. Here, it is undisputed that Dakota and Alliance adhered to the terms of their agreement, which provided that Dakota had full control over its personnel and would perform services as an independent contractor.

¶ 46    The Seventh Circuit's treatment of Illinois law has also been consistent with the cases we have cited here concerning the lack of an agency relationship. In *Kolchinsky v. Western Dairy Transport, LLC*, 949 F.3d 1010, 1011 (7th Cir. 2020) (*per curiam*), William Bentley, the sole owner of carrier Bill Bentley Trucking, LLC, rear-ended a car while en route to pick up a load arranged by shipping broker WD Logistics (WD). The plaintiff sued Bentley, WD, and Western Dairy Transport, LLC (Western Dairy), which was a carrier owned by the same parent company as WD but had the distinct roles of owning and leasing trucks and trailers and hauling freight. Western Dairy supplied the trailer used by Bentley. *Id.* at 1011-12.

¶ 47    While WD instructed Bentley to transport the cargo to its destination, the route to be used was entirely up to Bentley. *Id.* at 1012. Bentley provided regular freight-transportation for WD, pursuant to a carrier-broker agreement, and the contract provided that Bentley was an independent contractor and retained full control over Bentley's personnel. *Id.* When Bentley accepted a job from broker WD, Bentley agreed to call WD daily with status updates, protect the freight, and notify the broker of any damage. *Id.*

¶ 48    The trial court granted summary judgment in favor of WD and Western Dairy, and the Seventh Circuit affirmed. *Id.* at 1013. The court reasoned that WD's requirement that Bentley contact it while carrying its loads, including a daily status call, and the fact that WD could charge Bentley Trucking for damage failed to demonstrate the same degree of control that existed in *Sperl* and *Powell*. *Id.* at 1013-14. The court further found that it was undisputed that WD and Bentley adhered to the terms of their agreement, which stated that Bentley had full control over its personnel, was solely responsible for operational costs and equipment, and would perform services as an independent contractor. *Id.* at 1014. Additionally, WD did not deduct income taxes or social security contributions from Bentley like it would for an employee, and either party could terminate the relationship at any time. *Id.* Bentley was solely responsible for all payroll-related expenses. *Id.*

¶ 49    Similarly here, the facts that Alliance gave Dakota directions concerning pickups and drops, daily status updates, seal integrity, cargo security, and freight bills and that Alliance imposed fees on Dakota for late or damaged deliveries are insufficient to establish an agency relationship because those directions pertained to ancillary aspects of the transportation itself. Accessorial charges, rate and cost adjustments, and fuel surcharges relate to billing for transportation services and do not dictate control over the transportation itself. See *id.* at 1013; see also *Ying Ye v. Global Sunrise, Inc.*, No. 18-cv-1961, 2021 WL 5083753, at *3 (N.D. Ill. Nov. 2, 2021) (applying Illinois law and ruling that rate confirmation specifying pickup and delivery schedule, denying accessorial charges, and imposing 15% rate reduction for late delivery was inadequate to support agency relationship).

¶ 50    Plaintiff's remaining points do not support finding an agency relationship. The fact that Dakota was required to insure Alliance as an additional insured and indemnify it simply showed

the parties' intent to keep the risk of loss with Dakota and its liability insurer. See *Oliveira-Brooks v. Re/Max International, Inc.*, 372 Ill. App. 3d 127, 136 (2007) (evidence of naming the defendant as an additional insured could not, "as a matter of law, create a genuine issue of material fact to establish an actual agency relationship without some indicia of the right to control the day-to-day real estate business operations"); *Sperl*, 408 Ill. App. 3d at 1058 (focusing on the employer's right to control behavior). Moreover, Alliance's non-solicitation clause had no connection to Dakota's drivers and their transportation of the trailers. See *The T. Le v. Total Quality Logistics, LLC*, 2018 OK CIV APP 71, ¶ 22, 431 P.3d 366 (non-solicitation clause did not evidence shipper's control over driver). Evidence regarding performance metrics scoring delivery drivers has also been rejected as legally insufficient to establish agency. *Scheinman v. Martin's Bulk Milk Service, Inc.*, No. 09 C 5340, 2013 WL 6467525, at *10-11 (N.D. Ill. Dec. 9, 2013) (setting performance standard of 98% on-time deliveries and requiring an electronic software program for communications did not reasonably suggest how the driver was to haul the load). Furthermore, plaintiff's references to Alliance's marketing and advertising did not support an agency relationship between Alliance and Dakota/Lewis. See *Kolchinsky*, 949 F.3d at 1015 (finding no apparent agency where plaintiffs could not have relied on broker's logo at time of accident).

¶ 51    Alliance exercised little, if any control over Dakota's and its drivers' performance of the transportation work, as opposed to control over the result of the assigned task or matters ancillary to the work to be performed. Furthermore, "the distinguishing characteristic of an agent is that he represents another contractually." *Petersen*, 267 Ill. App. 3d at 784. "An agent, '[w]hen properly authorized, *** makes contracts or other negotiations of a business nature on behalf of his principal, by which his principal is bound.' " (Internal quotation marks omitted.) *Id.* (quoting *Sobel*

*v. Franks*, 261 Ill. App. 3d 670, 679 (1994)). Here, Dakota had no authority to bind Alliance contractually to a third party because the contract between Alliance and Dakota forbade Dakota from subcontracting any of Alliance's work.

¶ 52     The evidence, together with reasonable inferences drawn therefrom, does not demonstrate a substantial factual dispute, and the assessment of witness credibility or the determination regarding conflicting evidence is not decisive to the outcome. All the evidence, viewed in the light most favorable to plaintiff, overwhelmingly favors the conclusion the Lewis and Dakota were not Alliance's agents. No contrary verdict based on the evidence could ever stand.

¶ 53                                    III. CONCLUSION

¶ 54     For the foregoing reasons, the judgment of the circuit court entered against Alliance is reversed. This ruling does not affect the judgment against Dakota and Lewis, who were not parties to this appeal.

¶ 55     Reversed.

---

***Cornejo v. Dakota Lines, Inc.*, 2023 IL App (1st) 220633**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 17-L-003274; the Hon. Bridget J. Hughes, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Michael Resis, of Amundsen Davis, LLC, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Bradley M. Cosgrove, Yvette Loizon, and Jack J. Casciato, of Clifford Law Offices, P.C., of Chicago, for appellee. |

---